Mr. Justice Reed
delivered the opinion of the court, as follows:
The appeal brings here the correctness of the ruling by the Court of Claims which allows interest on a claim against the appellant, the United States. The cross appeal raises an issue that the compensation awarded is inadequate because the court failed to consider certain evidence as to the value for lease or use of the property involved.[1] The judgment was entered upon a petition filed under authority of a private jurisdictional act, quoted in the margin.[2]
*618 This controversy bad its inception on March 25, 1923. At that time Edward F. Goltra was the lessee of four tugboats and 19 steel barges belonging to the United States. While tied up for the winter on the Mississippi at the Port of St. Louis, they were repossessed, because of an alleged breach of the lease, by Colonel Ashburn, Chief of the Inland and Coastwise Waterways Service, under orders from the Acting . Secretary of War. Apparently some unloading facilities were also seized. In several court proceedings to recover possession Mr. .Goltra was defeated.[3] It would be futile to examine as to'whether these adjudications determined all or any controversies between the parties, since the jurisdictional act opened the doors of the Court, “notwithstanding the lapse of time or the bar of any statute of limitations or previous court decisions.” Suing -under this special legislation Mr. Goltra[4] sought damages for the wrongful- talcing of the fleet and facilities and recovered $350,000 with six percent interest from March 25, 1923, to the date of payment. The Government assigns error only to the allowance of interest and the executors only to the refusal to consider certain proffered evidence.
By a contract of 1919, with a supplement of 1921, Mr. Goltra leased the fleet of river boats for governmentally supervised operation as common carriers on the Mississippi and its tributaries from the Chief of Engineers as lessor. The lessor was acting for the War Department, the executive agency in charge of the boats. The term of the lease was five years from the delivery of the first unit of the fleet, which occurred on July 15, 1922. All net earnings were sequestered during the term for application upon the purchase of the fleet at cost or appraised value as detailed in the lease, with provision for subsequent installment payments over sixteen years. Section eight provided for termination by the lessor upon the lessee’s noncompliance “in his judgment, with any of the terms and conditions” and for the return to the lessor of the plant, barges, and towboats.
On March 4, 1921, the Secretary of War consented, in accordance with the lease, that Mr. Goltra’s tariffs should be 80 percent of the prevailing rail tariffs. This consent was withdrawn in May 1922, before the delivery of the boats, and a consent limited to specific articles substituted. A control over the amount of grain to be carried was delegated to the Federal Manager of the Mississippi-Warrior River Service, a government corporation which operated a competing line. The enterprise got under way in the *619 summer of 1922 and was immediately entangled in the- ordinary vicissitudes of river transportation. The towboats had mechanical deficiencies; the open barges were not suitable for grain or other perishables; low water seriously interfered with navigation. After a few months towing by one tug, the fleet went into winter quarters late in the fall. Before business was resumed, Mr. Goltra was notified.on March 4, 1923, by the Secretary of War that the lease was terminated and he was directed to turn over the towboats, barges and unloading facilities to Colonel Ashburn. Obedience to this order was refused and on March 25, 1923, Colonel Ashburn, under orders from the Acting Secretary of War, took possession of the fleet without the consent of Mr. Goltra or his employees, for the use and benefit of the United States.
The seizure was without the knowledge of the Chief of Engineers, who was the lessor empowered by its terms to terminate the lease, and that officer had not reached any conclusion to the effect that Mr. Goltra had in any manner failed in his obligations under the contract. Subsequently, in April, the Chief of Engineers terminated the lease pursuant to section eight. The action did not represent his judgment but was done under direction of his superior, the Secretary of War.
The Court of Claims fixed the damages as of the time of seizure, with interest to the date of payment “not as interest but as a part of just compensation.”
Interest. By statute,[5] derived from the Act of March 3, 1863, no interest is allowed on any claim up to the time of the rendition of judgment by the Court of Claims. This accords with the traditional immunity of the Government from the burden of interest unless it is specifically agreed upon by contract or imposed by legislation.[6] Without controverting this general rule, the executors find authority for the allowance of interest in the provision of the jurisdictional act for “just Compensation . . . for certain vessels and unloading apparatus taken, whether tortiously or not . . ., for the use and benefit of the United States.” Their argument is that the words “just compensation” have within themselves the same legal significance of interest on the award or damages from the date of the taking as has been given to these same words in the Fifth Amendment. They further urge that this interpretation is required by the phrase in the act “for the use and benefit of the United States” and the accepted finding that Colonel Ashburn’s taking was for that purpose. In support of this position,. *620 the ruling of this Court in Seaboard Air Line Railway Company v. United States [7] and subsequent similar authority [8] is relied upon.
In the Seaboard case, section 10 of the Lever Act authorizing the taking by eminent domain of property for the public use on payment of just compensation was under examination. It contains no specific provision for interest. This Court held that a taking under the authority of section 10 required the just compensation "provided for by the Constitution” and that such compensation is payable “as of the time when the owners were deprived of their property.” [9] This case, however, and the others cited in the preceding paragraph, involved the requisitioning or taking of property by eminent domain under authority of legislation. The distinction between property taken under authorization of Congress and property appropriated without such authority has. long been recognized.[10] Acts of government officials in taking property without authorization of Congress confer no right of recovery upon the injured citizen.[11] There are two instances of Congressional ratification of takings which turned tortious acts into the exercise of the power of eminent domain and placed upon the Government the duty to make "just compensation,” including sums in the nature of interest. These are United States v. Creek Nation [12] and Shoshone Tribe v. United States.[13] In both cases there was a special jurisdictional act. In neither case was interest expressly allowed. In both this Court found Congressional confirmation of the previously unauthorized acts; in the Creek case, by disposition of the wrongfully acquired lands and failure.to seek cancellation of the disposals after “full knowledge of the facts” [14] and in the Shoshone case by "the statutes already summarized, recognizing the Arapahoes equally with the Shoshones as occupants of the land, accepting their deeds of cession, assigning to the tribes equally the privilege of new allotments, and devoting to the two equally the award of future benefits.”[15]
In the case now-before us, however, there is neither the requisite Congressional authority before the taking nor any ratification or confirmation of the tort after the taking, which would justify a conclusion that the fleet was acquired by *621 eminent domain. The jurisdictional act in itself is not an exercise of the power of eminent domain.[16] As the lease required action by the Chief of Engineers, the attempt to cancel it by the letter of the Secretary of War of March 3, 1923, and the order of the Acting Secretary of March 22, 1923, to take possession was unauthorized. The lower court found the taking tortious.[17] Nor can it be said that the continued possession and use by the United States indicated any confirmation or ratification of the tortious act, so as to bring this case within the rule of the Greek or Shoshone cases. A reading of the reports of the prior litigation[18] makes abundantly clear that the United States relied upon the termination of the lease by the Chief of Engineers which was practically contemporaneous with, though subsequent to, the taking, as their justification for possession of the fleet and property. This reliance found complete support in the various cited decisions of the courts, even though Mr. Goltra’s ■ petition for rehearing in this Court pointed out that the letter of the Chief of Engineers was written to justify the seizure.[19] Notwithstanding these definite judicial decisions upon the rights of the parties, Congress felt that Mr. Goltra may not have had fair treatment. It passed the present jurisdictional act and to that the executors are relegated to find authority to allow interest.
Such acts are to be strictly construed.[20] In the preceding paragraphs we have demonstrated that this unauthorized taking and judicially approved retention was in no sense an exercise of the power of eminent domain. We see no ground to read into this act of grace, which was apparently drawn to rectify what Congress felt might be a wrong, an authority to allow interest as a part of just compensation. If interest was to be allowed for so long a period upon an ordinary claim, and contrary to established governmental practice, Congress would have so declared.[21]
*622 Evidence. The main issue raised by the appeal of Mr. Goltra’s executors relates to the evidence. In its opinion the Court of Claims said:
“It is contended by the plaintiff that, in arriving at just compensation, an offer to rent the fleet made years after the' fleet had been seized and the rental value of similar vessels-on the Mississippi River should be taken into consideration. These contentions cannot be sustained.”
Assuming that these items of evidence were competent, we-cannot say that the Court of Claims, making a jury award, was bound to give them weight. The actual damages, suffered by Mr. Goltra were highly speculative, especially, since the contract was subject to lawful' cancellation whenever the Chief of Engineers rightly or wrongly but in good faith determined that Mr. Goltra was violating its provisions. Mr. Goltra’s operation under the lease had been a losing venture. Under these circumstances, the Court of Claims may have believed that an offer to purchase, made in May 1925, was too remote to influence its judgment and that the rental value of other vessels on the Mississippi, not subject to the same restrictions as those taken by the Government, was too unreliable to afford a useful comparison. It was for the Court of Claims to decide what weight such facts deserved, and we construe its opinion only as holding that under the circumstances of this case the evidence was not considered to be of any assistance in reaching a conclusion.
Mr. Goltra’s executors also complain of the failure of the Court of Claims to make certain findings, but there is no indication that the Court of Claims did not consider the facts which were embodied in the proposed findings.
The judgment in No. 191 is modified as indicated in the opinion and, as modified, affirmed; the judgment in No. 192 is affirmed.
The Chief Justice and Me. Justice Black took no part in the consideration and decision of these appeals.

 Both parties also sought review by petition for certiorari because of this Court’s decision in Colgate v. United States, 280 IT. S. 43, and Assiniboine Indian Tribe v. United States, 292 U. S. 606. The inclusion of the phrase “as of right” in the jurisdictional act sufficiently makes clear the intention of Congress to authorize either party to take a technical appeal to this Court. Cf. House Report No. 828, 73d Cong., 2d Sess., p. 3.

 Act of April 18, 1934, 48 Stat. 1322, c. 150:
“Be it enacted . . . that j urisdiction is hereby conferred upon the Court of Claims of the United States, whose duty it shall be, notwithstanding the lapse of time or the bar of any statute of limitations or previous court decisions, to hear, consider, and render judgment on the claims of Edward E. Goltra against the United States for just compensation to him for certain vessels and unloading apparatus taken, whether tortiously or not, on March 25,1923,, by the United States under orders of the Acting Secretary of War, for the use and benefit of the United States; and any other legal or equitable claims arising out of the transactions in connection therewith: Provided, That separate suits may be brought with respect to the vessels and the unloading apparatus, but no suit shall be brought after the expiration of one year from the effective date of this Act: Provided further, That either party may appeal as of right to the Supreme Court of the United States from any judgment in said case at ahy time within ninety days after the rendition thereof, and any judgment rendered in favor of the claimant shall be paid in the same manner as other judgments of said Court of Claims are paid.”

 Secretary of War v. Goltra, 7 F. (2d) 838; Ex parte United States, 263 U. S. 389; Goltra v. Secretary of War, 271 U. S. 536; Goltra v. Secretary of War, 29 F. (2d) 257, cert. denied, 279 U. S. 843; Goltra v. Inland Waterways Corp., 49 F. (2d) 497.

 On his death his executors were substituted.

 Judicial Code $ 177.

 1. Op. Atty. Gen. 268,550, 554; 3 id. 635; 4 id. 14,136,286; 7 id. 523; 9 id. 449; Tillson v. United States, 100 U. S. 43, 47; Angarica v. Bayard, 127 U. S. 251, 260; United States v. North Carolina, 136 U. S. 211, 216; National Volunteer Home v. Parrish, 229 U. S. 494, 496.

 261 U. S. 299.

 Phelps v. United States, 274 U. S. 341; Jacobs v. United States, 290 U. S. 13; Liggett & Myers v. United States, 274 U. S. 215: Brooks Scanlon Corp. v. United States, 265 U. S. 106, 123.

 Cf. Danforth v. United States, 308 U. S. 271, 284-286.

 See United States v. North American Company, 253 U. S. 330, 333-334, the Seaboard caso at pages 304 and 305, the Phelps case at pages 343 and 344, and the Jacobs case at page 18.

 Hooe v. United States, 218 U. S. 322, 333; United States v. Buffalo Pitts Co., 234 U. S. 228, 235.

 295 U. S. 103.

 299 U. S. 476.

 295 U. S. at 110.

 299 U. S. at 495.

 Shoshone Tribe v. United States, 299 U. S. 476, 492.

 Hawkins v. United States, 96 U. S. 689, 697; Plumley v. United States, 226 U. S. 646, 647; Yuhasz v. United States, 109 P. (2d) 467, 468; Burton Coal Co. v. United States, 60 Ct. Cls. 294, 312; Lutz Co. v. United States, 76 Ct. Cls. 405, 415.

 See note 3, supra.

 Brief filed July 16, 1926, pp. 33-34: “The opinion violates the elementary common-law rule that a trespass cannot be justified by an Act subsequent. It appears from the record that counsel for defendant caused this letter to be written for the sole purpose of justification of a prior trespass. It was not the act, therefore, of Major-General Beach for the purpose of canceling the contract, but the act of counsel for defendant to excuse the illegal act. (We quote from the record: ‘Mr. Hooker. I caused this letter to be executed and delivered to Mr. Goltra for the purpose of meeting that objection. The Court. You caused a letter to be written a month after the seizure to justify the seizure and an attempted cancellation which had already been had? Mr. Hooker. Yes; I did.’ Certainly bad faith is shown here.”

 Dubuque & Pacific R. R. v. Litchfield, 23 How. 66, 88; Slidell v. Grand Jean, 111 U. S. 412, 437-38; Coosaw Mining Co. v. South Carolina, 144 U. S. 550, 562; Blair v. Chicago, 201 U. S. 400, 471; Charles River Bridge v. Warren Bridge, 11 Pet. 420, 544; see Russell v. Sebastian, 233 U. S. 195 205

 Cf. Tilison v. United States, 100 U. S. 43, 46; Boston Sand Co. v. United States, 278 U. S. 41, 46.