**LOYAL BAND OR GROUP OF CREEK INDIANS et al. ex rel. BRUNER et al. v. UNITED STATES.**

Appeals Docket No. 7.

United States Court of Claims.

Feb. 6, 1951.

Wilfred Hearn, Washington, D. C., George E. Norvell, Washington, D. C., on the brief, for appellants.

Ralph A. Barney, Oklahoma City, Okl. A. Devitt Vanech, Asst. Atty. Gen., for appellee.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

This case is before us on appeal from a decision of the Indian Claims Commission denying the plaintiffs' claim, Commissioner Witt dissenting. The claim is for a balance of $600,000 asserted to be owing to the Indians because of an award, which, they claim, the United States Senate, acting as an arbitrator, made to them in 1903, in the sum of $1,200,000, of which they have been paid only $600,000.

Some years before the outbreak of the Civil War, the Creek Nation of Indians had been located in the Indian Territory which is now the eastern part of the State of Oklahoma. The members of the tribe were, at the commencement of the war, about equally divided in their loyalties between the Union and the Confederacy. The government of the tribe, however, supported the Confederacy, and on July 10, 1861, concluded a treaty of alliance with the Confederacy. The members of the tribe who favored the Union were driven from the reservation and took refuge behind the Federal lines in Kansas. Their improvements on their lands, and their personal property, were taken or destroyed. Many of the male members of the Loyal Creeks, as they came to be called, joined the Union Army.

At the end of the Civil War, the United States and the Creek Nation concluded a treaty on June 14, 1866, 14 Stat. 785. In this treaty, in Article 3, the United States recognized the sufferings and losses of the Loyal Creeks, and provided for the payment to them of $100,000 in proportion to their losses. In Article 4 the treaty provided that a survey should be made, under the direction of the Secretary of the Interior, by the Superintendent of Indian Affairs for the Southern Superintendency and the Indian Agent for the Creek Nation to determine the indentity of the Loyal Creeks and the amounts of their losses, and that when the awards so made should be approved by the Commissioner of Indian Affairs and the Secretary of the Interior, they should be paid within one year after the ratification of the treaty or as soon as $100,000 could be raised by the sale of lands, ceded by the Creek Nation to the United States, to other Indians.

The roll of Loyal Creek Indians and Freedmen made pursuant to the treaty contained 1,523 names. Claims for losses in the amount of $5,090,808.50 were presented, but were allowed only in the amount of $1,-836,830.41. The $100,000 mentioned above was apportioned among those whose claims had been found valid.

An agreement made between the United States and the Creek Nation, and embodied in an Act of Congress approved March 1, 1901, 31 Stat. 861, covered many subjects. Section 26 of that agreement provided:

"All claims of whatsoever nature, including the 'Loyal Creek claim' under Article Four of the treaty of eighteen hundred and sixty-six, and the 'Self-emigration claim' under Article Twelve of the treaty of eighteen hundred and thirty-two, which the tribe or any individual thereof may have against the United States, or any other claim arising under the treaty of eighteen hundred and sixty-six, or any claim which the Unit-

ed States may have against said tribe, shall be submitted to the Senate of the United States for determination; and within two years from the ratification of this agreement the Senate shall make final determination thereof; and in the event that any sums are awarded the said tribe, or any citizen thereof, provision shall be made for immediate payment of same.

"Of these claims the 'Loyal Creek claim,' for what they suffered because of their loyalty to the United States Government during the civil war, long delayed, is so urgent in its character that the parties to this agreement express the hope that it may receive consideration and be determined at the earliest practicable moment."

The Senate in the performance of its duty under Section 26 referred that matter to its Committee on Indian Affairs, which had also before it the Indian Appropriation Bill, which had originated in the House. The Committee, in its report made on February 16, 1903, said:

"We consider the Creeks had strong equities and have deducted from the amount allowed by Commissioners Hazen and Field, the $100,000 which has been paid them, and deducted a further sum of $536,-830.40 and recommend the payment of the balance amounting to $1,200,000, to be distributed to the claimants or their heirs, in the proportion indicated by the original list of awards."

The Committee also reported a proposed amendment to be inserted in the pending Indian Appropriation Bill, the beginning and pertinent part of which amendment was as follows:

"In pursuance of the provisions of Section 26 of an act to ratify and confirm an agreement with the Muscogee or Creek tribe of Indians, and for other purposes, approved March 1, 1901, there is hereby awarded as final determination thereof on the so-called 'loyal Creek claims,' named in said section 26, the sum of $1,200,000, and the same is hereby appropriated out of any money in the Treasury not otherwise appropriated, and made immediately available."

In the discussion of the proposed amendment in the Senate, Senator Quarles reminded the Senate that, in regard to the amendment, it was "sitting as a court or (sic) arbitration and (was) not engaged in the ordinary method of legislation" and that "The determination of the Senate upon this proposition will amount to an award, upon which an action will lie quite independently of the fate of this provision in the other House of Congress." He also made other statements emphasizing the same point. 36 Cong.Rec. 2252.

The Senate agreed to the amendment, 36 Cong.Rec. 2255, and passed the Indian Appropriation Bill as so amended. The House refused to concur in the Senate's amendment, and the bill went to a Conference Committee which, after several days' discussion, principally about the Senate's amendment, agreed that the words "six hundred thousand dollars" should be substituted for the figures "$1,200,000", and that the following language should be inserted in the text.

"*Provided*, That said sum shall be accepted by said Indians in full payment and satisfaction of all claim and demand growing out of said loyal Creek claims, and the payment thereof shall be in full release of the Government from any such claim or claims."

The report of the Conference Committee was agreed to by the Senate on February 25, 1903, 36 Cong.Rec. 2627. The House conferees submitted a statement, in addition to the Conference report, in which it was said:

"No. 27 the House recedes with an amendment, making the appropriation $600,000 instead of $1,200,000. The amendment provides for the payment of the so-called Loyal Creek claim. It has been mooted for some time, and it is claimed that the Senate has heretofore been made arbiters by action of both bodies of Congress, and that, acting as such, they have determined that $1,200,000 was just and due. The sum fixed herein is a compromise and provision is made in the amendment that it be accepted in full payment of all claims and demands and act as a general relief of

such claim against the Government. (36 Cong..Rec. 2768.)"

In the discussion, in the House, of the Conference report, two of the House Conferees said:

"Mr. Sherman. * * * I was about to say, Mr. Speaker, that the main item of appropriation added by this report is $600,000 to pay the so-called Loyal Creek claims.

"This is an item which the conferees on the part of the House believe to be a gratuity; that is, that it is a claim about which we believe there was no legal obligation on the part of the Government. The contention of the Senate conferees was the reverse. Their contention was that by the act of the two Houses in referring this claim to the Senate as arbitrators in the last Congress, and by the Senate appropriating in this bill, or inserting in this bill, a provision fixing the amount of the arbitration at $1,200,000, that thereby the United States became bound to the payment of that claim of $1,200,000.

"It was the claim which kept us in conference longer by many hours—yes, by several days—than we would have been but for this. At the conclusion of a protracted conference the House conferees receded, with an amendment providing that the amount paid should be $600,000, rather than $1,200,000, and with a provision that the payment of this sum should be in full for all claims in satisfaction of the claims of these Indians, and the payment should be accepted as a discharge of the United States Government from those claims. The House conferees believed it wisdom under all the circumstances to dispose of this claim now by the payment of $600,000, and believed by doing so that we would save to the Government money, because were it not paid now the Indians would surely present this claim to every succeeding Congress, and one of these days probably slip it through at $1,200,000. So we believe —

"Mr. Curtis. In view of the fact that the Senate had found in the arbitration for $1,-200,000.

"Mr. Sherman. So that we believe, in disposing of the claim as we have, we have saved to the Government $600,000. (36 Cong.Rec. 2769.)"

The House agreed to the Conference report, 36 Cong.Rec. 2770, and the bill became the Act of March 3, 1903, 32 Stat. 982. The provision here pertinent is at page 994. On May 22, 1903, the National Council of the Creek Nation by resolution accepted the sum of $600,000 in full payment of the Loyal Creek claims, thus fulfilling the condition written into the Act, and quoted above.

The plaintiffs claim that by the agreement between the United States and the Creek Nation, embodied in Section 26 of the Act of March 1, 1901, the parties agreed that the Senate of the United States should arbitrate and determine the claims of the Loyal Creeks; that the Senate, by its vote to adopt the amendment to the Indian Appropriations Act recommended by its Committee on Indian Affairs, determined the claims and awarded the Loyal Creeks $1,-200,000, half of which has never been paid them. They claim that the Senate's award conferred upon them a legal right to the amount awarded, and that, now that the Indian Claims Commission Act, 60 Stat. 1049, 25 U.S.C.A. §§ 70, 70a–70w has given them a forum, they may recover the unpaid balance of $600,000.

The Government urges that the Senate's award, as arbitrator, was not the $1,200,000 named in its action in approving the amendment to the Indian Appropriation Act recommended by its Committee on Indian Affairs, but was the $600,000 named in the Appropriation Act as it finally passed the Senate.

The Indian Claims Commission, whose decision adverse to the Indians is here under review, adopted the position urged by the Government. The plaintiffs say that the Senate, like any other arbitrator, once having made its award of $1,200,000, became, as arbitrator, *functus officio* and hence its later action could not deprive the plaintiffs of its right to the amount awarded. The Commission, in its opinion, said that while that was the ordinary rule as to arbitrations, here the parties, when they made the arbitration agreement, must have been aware that the Senate could not make an effective award unless and until it could

get the agreement of the House to pay that award, hence the Senate did not intend that its earlier determination should be final. The Commission points to the fact that the arbitration agreement itself provided that the award, when made, should be paid, as indicating that the parties must have intended that the Senate would only make such an award as it could get the House to concur in by collaborating in its payment.

We think the decision of the Indian Claims Commission is erroneous. We have no doubt that the parties meant, by the agreement to submit the claims of the Loyal Creeks to the Senate for determination, what they plainly said, viz., that the Senate should determine the claims and that when they had been determined, the Government would pay them. The Government was one of the parties to the agreement, and the House, as well as the Senate, acted for the Government in making the agreement, embodying it in a statute. Reading the agreement as the Commission has read it, it means nothing at all. It means only that the Loyal Creeks should receive such amounts, if any, as might be appropriated for their benefit. But they, like all the rest of us, had always had that right.

We think the parties supposed and intended that, when the Senate had made its award, the Government, through whatever processes were necessary to make the money available, would pay the award. The agreement expressly provided that "provision shall be made for immediate payment of same". That meant that, if an appropriation was necessary, an appropriation would be made.

As to the Senate's thinking on the question, when it made its determination of $1,200,000, we have no doubt that it intended that to be its award, pursuant to the agreement. If any Senator was not otherwise aware of the agreement, and the part which the Government had agreed that the Senate was to play in fulfilling the agreement, he was made aware by the pointed statements of Senator Quarles, quoted above. He knew that the Senate was doing two things, making an award as an arbitrator, and initiating legislation to provide the money to pay the award. He knew that the one

would be an accomplished fact, regardless of the success or failure of the other. We are not unmindful of admonitions not to attach too much weight to mere statements of members on the floor of Congress, in determining legislative intent. But here the question is only a question of awareness. Was the Senate aware of its duty under the agreement? If it was, the solemn agreement of its Government required that it perform it. The statement of the Senator unquestionably made it so aware, and relieves our minds of any misgiving that perhaps the Senate was intending merely to perform a legislative function.

If anyone had suggested, in answer to Senator Quarles, what the Government here urges and the Commission has decided, that the Senate could not make its determination until it had learned what the House would agree to appropriate, it would have been obvious that he was urging the Senate to abdicate its duty under the agreement. For an arbitrator to delegate his decision to an outsider, particularly to one who was an important agent of one of the parties, would be a gross impropriety, and we are not willing to suppose that the Senate had any such intent.

We think that the reason that the Senate embodied its two actions in one document, its amendment to the Indian Appropriation Bill, rather than in two, was that it did not occur to it that the House of Representatives might repudiate the agreement in which it had joined only two years before, viz., that the Government would immediately pay what the Senate would award.

It appears from the statement on the floor of the House by Mr. Sherman of the House conferees that the Senate conferees insisted in the conference upon the finality of the Senate's award as creating a legal liability of the Government. This further contradicts the Commission's view that the parties intended that the Congress, and not the Senate, was to arbitrate the claims.

██ We conclude that the Senate's action, in finally agreeing to the conference report appropriating the lesser sum and requiring the Indians to agree to accept that sum in full satisfaction of their claims, did

not destroy the Indians' right to the sum formerly awarded them by the Senate. The soundness of the generally accepted doctrine that once an arbitrator has made his award, the rights of the parties to that award are vested and cannot be destroyed by a later attempted modification of his award is well illustrated here. The pressures brought to bear upon the Senate as arbitrator, by the House as legislator and economizer, not aware of the merits of the claims, were calculated to compel and did compel the arbitrator, as legislator, to change its position. Because of its dual role, the arbitrator here was peculiarly vulnerable.

■ The release which the Creek Nation was required, by the terms of the Appropriation Act, to sign in order to get the $600,-000 appropriated was, we think, not binding upon it or upon the plaintiffs. Apart from any consideration of the inequality of status of the Government and the Indians, the payment of a lesser sum in purported discharge of a larger liquidated sum which is clearly owed, does not discharge the unpaid portion of the debt. United States v. Bostwick, 94 U.S. 53, 67, 24 L.Ed. 65; Fire Insurance Association v. Wickham, 141 U.S. 564, 12 S.Ct. 84, 35 L.Ed. 860; Pickley v. United States, 46 Ct.Cl. 77.

The plaintiffs claim interest on the $600,-000, from the time of the Senate's determination down to date, saying that the "fair and honorable dealings" clause of Section 2 of the Indian Claims Commission Act of August 13, 1946, authorizes the award of interest. The plaintiffs say that Section 2516(a) of the Judicial Code, 28 U.S.C.A., which forbids the allowance of interest on a claim against the United States, unless the interest is agreed to by contract or is authorized by an Act of Congress, applies only to judgments of this Court, and does not forbid the Indian Claims Commission to award interest. The Government says that Section 2516(a) is merely declaratory of a generally applicable doctrine making the Government immune from interest. It cites United States v. Goltra, 312 U.S. 203,

207, 61 S.Ct. 487, 490, 85 L.Ed. 776, where it is said that Section 2516(a), then Section 177 of the Judicial Code, "accords with the traditional immunity of the Government from the burden of interest unless it is specifically agreed upon by contract or imposed by legislation." It cites United States v. New York Rayon Co., 329 U.S. 654, 67 S.Ct. 601, 91 L.Ed. 577, and Albrecht v. United States, 329 U.S. 599, 67 S. Ct. 606, 91 L.Ed. 532, indicating the Supreme Court's adherence to the view that the Government need not pay interest.

■ If it were not for these emphatic expressions of the Supreme Court, we would be inclined to think that such a departure from fair and honorable dealing as is shown by the Government's failure, for some forty-seven years, to pay a definite sum which it had agreed to pay, would require it to compensate the plaintiffs by paying it interest. In deference to the views of the Supreme Court, we do not so decide.

The decision of the Indian Claims Commission is reversed, and the case is remanded to the Commission with directions to award the plaintiffs six hundred thousand dollars ($600,000).

It is so ordered.

HOWELL and WHITAKER, Judges, concur.

JONES, Chief Judge (concurring).

I agree that when the Senate took final action as a court of arbitration its finding became a liquidated demand.

I cannot agree that it did so until final action on the bill of which the amendment was a part.

The Senate had a method of taking final action at once, if it wished to do so; that is, by simple resolution [1] making the award. Such a resolution would not have required action by the House in order to be final as an award.

The Senate chose not to take that course. Instead it made the resolution a part of a bill that required action by both houses of Congress. It did this with full knowledge

---

1. As distinguished from a Senate or House Joint or Concurrent Resolution, either of which would have required action by the other body.

that no part of a general bill becomes effective until final passage. A deed though complete in form but with a mortgage clause attached does not become absolute until the mortgage conditions are satisfied.

The language of the award was the same both times the Senate acted, with the exception of the amount appropriated. It was during the same session of the Congress. When the Senate chose to tie the arbitration award onto a bill carrying other provisions it automatically deferred final action on the award until passage of the bill. Any vote on any part of the bill was tentative.

The conclusion of the Commission was legally correct, except for the provision as to equity and fair dealing embodied in section 2 of the act establishing the Indian Claims Commission. The terms of this section are very broad and include among other things the jurisdiction to hear and determine claims of American Indians "in law or equity arising under * * * treaties of the United States * * * all other claims in law or equity * * * and * * * claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity."

By the terms of a treaty the Senate was made a court of arbitration in respect of this claim. The plaintiffs had a right to expect the Senate to exercise its own judgment. While under long standing legislative rules and practice the Senate action did not become final when the first vote was taken and the Senate ultimately yielded on the whole question, it is very clear that if the Senate had exercised its unhindered judgment it would have allowed the additional $600,000. That fact shines through the entire proceeding. I can think of no clearer case for the application of the broad jurisdictional provisions of the quoted section.

By every rule of fair dealing that I have known from my youth up, and in equity, the plaintiff Indians are entitled to the $600,000 for which this suit is brought. Prior to 1946 they were prevented from receiving it by the terms of the law as it then existed. I think the primary purpose of the equity and fair dealing provisions of the act of 1946 was to take care of just such cases as this. It was to relieve from the harsh provisions of law that equity was born.

In view of the negotiations between the parties and the terms of the agreement on which the Senate was to act, I do not regard the claim here involved as a gratuity.

For this reason I concur in the result reached by the court.

LITTLETON, Judge, concurs in the foregoing opinion.