## GOLTRA et al. v. UNITED STATES.
### No. 46064.

United States Court of Claims.
April 3, 1951.

Herman J. Galloway, Washington, D. C. (King & King, Harry D. Ruddiman, and Paul M. Rhodes, all of Washington, D. C., on the brief), for plaintiffs.

Kendall M. Barnes, Washington, D. C., H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

LITTLETON, Judge.

Plaintiffs are executors of the estate of Edward F. Goltra, deceased, and their claim arises from the requisition by the United States, through the War Production Board, September 6, 1943, of a Heyl & Patterson steel traveling or gantry crane. There is no dispute as to the value of the crane, the only issue before the court being whether the United States or the Goltra estate was the owner of the crane at the time of its requisition. If the Goltra estate was the owner at that time, it is entitled to recover as just compensation, the agreed value of the crane—$100,000 (an award in that amount having been made by the War Production Board to "persons unknown"). If the Government

620

already owned the crane, it is liable to plaintiff for no part of its value. Initially, other claimants were before the court, but they have formally relinquished their claims. The present action is the latest in nearly thirty years of litigation surrounding this steel crane. .

During the first World War, the Government became interested in developing and fostering water transportation by means of barges handled by towboats along the Mississippi-Missouri Rivers system, and to that end contracted for the fabrication of 19 modern steel barges and 4 towboats. Edward F. Goltra had played an extensive part in experiments leading to this development, and on May 28, 1919, the Government, represented by the Chief of Engineers, U. S. Army, entered into a contract with Goltra providing for the lease to Goltra of these barges and towboats. The lease was to extend for 5 years from the date of delivery of the first barge; provided that Goltra was to operate the barges as a common carrier under the rate regulation of the Secretary of War, and contained an option to purchase within the period of the lease. The net earnings were to be paid over to the Government as rent, but were to be credited upon the purchase price. A formula was provided for arriving at the purchase price. Provision was made for the termination of the lease upon a finding by the lessor that the provisions of the lease were not being complied with.

On May 26, 1921, the same parties entered into a supplemental contract wherein Goltra agreed to provide a tract of land in the City of St. Louis and construct thereon concrete foundations upon which the Government agreed to erect unloading facilities to service the newly constructed barges. The Government was to bear the initial cost of the unloading facilities, and Goltra was to maintain and use them under a lease substantially like that applying to the barges and towboats. It was provided that if Goltra did not exercise his option to purchase the unloading facilities, the Government might remove them from Goltra's property, and, further, that if the Government did not desire to re-

move the unloading facilities, the Government was to have the right to lease the land for 5-year periods with the privilege of renewals, the terms of such a lease to be worked out in accordance with a prescribed formula.

In the fulfillment of these contracts, the Government constructed and turned over to Goltra the fleet of barges and towboats. Goltra procured a suitable site for unloading facilities and constructed upon this land, which he held in fee, concrete runways for a large ore-handling bridge or crane. These runways, by permission of the Mississippi Valley Iron Company, extended from the river front on Goltra's property, back across that site and onto land adjoining Goltra's owned by the Mississippi Valley Iron Company. Upon these concrete foundations the Government erected a Heyl & Patterson ore-handling bridge, sometimes referred to as a gantry crane. The structure was of steel, almost 500 feet long, and was supported some 110 feet above the concrete runways on legs 300 feet apart. It was equipped with a 10-ton coal or ore bucket and with electrical equipment for raising or lowering the bucket, for moving the bucket laterally, and for moving the crane itself upon rails laid on the concrete runways. The cost of the crane to the Government was about $210,000, which amount did not include the concrete runways constructed by Goltra at a cost in excess of $36,000. Delivery to Goltra of the barges and towboats was made in July 1922; the unloading facilities were turned over to Goltra at the same time. Limited use was made of the equipment prior to closing down of river operations during the winter season of 1922–23.

In March 1923, the Secretary of War wrongfully and illegally terminated Goltra's lease of the barges, towboats, and unloading facilities, and seized all the movable equipment in the name of the United States. A detailed account of the course of events and of the litigation that followed appears in Goltra v. United States, 91 Ct. Cl. 42, decided April 1, 1940, and in the findings of fact made herein. It is sufficient here to note that Goltra regained

possession of the barges and towboats, by legal process, in September 1924, but was required by a Supreme Court decision to return possession to the Government about July 1926. During none of this time did Goltra receive any rental from the property occupied by the crane. Twice, since execution of the contracts, Goltra attempted unsuccessfully to exercise his option to purchase both the floating and fixed equipment. The Government first refused to consider Goltra's offer to purchase because it was prematurely made; later the Government refused to deal further with Goltra because the matter was involved in litigation.

By 1929, the crane had become a source of embarrassment to both Goltra and defendant. The huge structure encumbered Goltra's property and required protection from man and the elements. It was of no use to Goltra, nor did he, after the termination of his lease, have any right to use it. At the same time, he had been unable to collect any rental from the Government for the use of the land which the crane occupied. The government had no use for the crane, either at its present or at any other location. The crane's only market value at that time was as scrap and the Government estimated that the cost of dismantling and removing the structure would exceed its salvage value by some $35,000. At the same time, the authorized Government officials realized that they could not leave the crane on Goltra's land indefinitely without incurring liability for occupancy. Goltra was by this time making repeated demands for rental on the property, and these demands were being brought home to the responsible officials in the War Department. Overtures were made by the U. S. District Engineer, St. Louis, Missouri, looking toward some settlement. On October 14, 1929, Goltra advised the Government, by letter through the District Engineer, that if the Government would "abandon" to him the crane located upon his property he [Goltra] would release the Government from any claim for rental or compensation on account of the apparatus arising after the date of such "abandonment." By letter dated February 13,

1930, Goltra advised the Secretary of War that: "* * * if the United States and/or the Inland Waterways Corporation will immediately release and convey to me the said unloading apparatus and will immediately vacate and deliver to me possession of my property upon which said apparatus is located, I will release the Government from any and all claims accruing to me account of the aforesaid supplemental contract, save only my claims for use of my property, the expense of the caretakers (watchmen), and accrued interest on these said claims, all up to the date of the aforesaid conveyance and notice of release to me of my property."

At the time this letter was written, Goltra and the Inland Waterways Corporation were involved in litigation over the seizure of the barges, towboats, and unloading facilities. The Secretary of War replied on February 19, 1930: "* * * after careful consideration it has been determined to take no action at present regarding the unloading apparatus on account of pending litigation between yourself and the Inland Waterways Corporation in which said supplemental contract is involved."

The litigation between Goltra and the Inland Waterways Corporation did not end until April 6, 1931, when the Court of Appeals of the District of Columbia affirmed the judgment of the District Court sustaining Inland Waterways' demurrer to Goltra's complaint. Goltra v. Inland Waterways Corp., 60 App.D.C. 115, 49 F.2d 497. Thereafter on August 13, 1930, the Acting Secretary of War wrote Goltra as follows: "Referring to the conversations and correspondence heretofore had relative to an unloading apparatus erected upon lands owned by you at St. Louis, Missouri, under the provisions of a supplemental contract dated May 26, 1921, and subsequently terminated, you are advised that the United States claims no right, title or interest whatsoever in the said unloading apparatus, or in the real estate upon which it is situated, and waives whatever right, title or interest it may be thought to have in the same."

Although the contract had purportedly been terminated by the Secretary of War, it had been entered into on behalf of the Government by the Chief of Engineers, and Goltra on August 21, 1930, furnished that officer with a copy of the letter from the Acting Secretary of War and requested the Chief of Engineers to indicate whether he, as defendant's contracting officer, "concurred" in the action of the Acting Secretary of War. The Chief of Engineers replied by letter dated August 28, 1930:

"1. Reference is made to your letter of the 21st instant regarding the unloading apparatus erected on your property at St. Louis, Mo., pursuant to a certain supplemental contract dated May 27, 1921.

"2. In reply you are advised that the Chief of Engineers concurs in the letter addressed to you under date of August 13, 1930, in which you were advised that the 'United States claims no right, title or interest whatsoever in the said unloading apparatus, or in the real estate upon which it is situated, and waives whatever right, title or interest it may be thought to have in the same.'"

From the dates of receipt of these letters until the requisition of the crane in September 1943, Goltra and those who succeeded him in interest treated the unloading apparatus as belonging to them. The crane remained upon the Goltra property until 1932 or 1933 when it was moved (by one of the Goltra heirs) under its own power on the existing runways onto the property of the Mississippi Valley Iron Company, where it remained until date of requisitioning. The crane was moved in order that it might be better protected from the elements. Goltra and his successors in interest protected the crane, posted "keep off" signs upon it, appeared as prosecuting witness against a person apprehended stealing copper wire from it and, from time to time, entered into negotiations looking toward the crane's lease or sale. During the period from August 13, 1930, to August 25, 1943, when the War Production Board made its determination to requisition the crane, neither defendant nor the Inland Waterways Corporation (a Government corporation which had taken over a part of the Government-owned water transport system) undertook to use the crane, to claim title to or interest therein, or to exercise any control over or possession thereof. Until the crane was requisitioned by the defendant, neither the defendant nor the Inland Waterways Corporation had made any claim to plaintiffs that the ownership of the unloading apparatus rested in either the defendant or the Inland Waterways Corporation. During this entire period Goltra, during his lifetime, and plaintiffs thereafter, held themeselves out to the Government and to others as owners of the gantry crane. Although the idle structure continued to encumber plaintiffs' property, neither Goltra nor his successors in interest made any claim upon defendant for rental of the crane site after August 31, 1930.

On August 21, 1934, Goltra filed his petition in the Court of Claims (jurisdiction having been conferred by a special Act) for damages sustained because of defendant's wrongful termination of the lease-purchase contracts involving the barges, towboats, and unloading equipment. Goltra sought damages in excess of $10,000,000 and, among other things, included claims for (1) rent of the crane site from March 24, 1923, to September 4, 1924, and from July 1, 1926, to August 31, 1930; (2) pay of crane watchmen for the same period; (3) cost of removing crane above its salvage value; (4) cost of runway; (5) cost of removing runway in excess of salvage value; (6) reasonable rental value and value of the use of the unloading facilities exclusive of land and runways for the periods March 24, 1923, to September 24, 1924, and July 1, 1926, to July 21, 1934 (date of petition).

This court held that Goltra had been illegally and wrongfully deprived of his leases and options to purchase and, proceeding upon a theory of tort, entered judgment for $350,000 as a jury verdict compensating plaintiff for the damages sustained by him. Goltra v. United States, 91 Ct.Cl. 42, affirmed as modified, 312 U.S. 203, 61 S.Ct. 487, 85 L.Ed. 776. At the time that case was decided, the court had before

it substantially the same evidence regarding the sale or "abandonment" of the crane as has been presented here. Finding 52 of the earlier case sets forth the letters between Goltra, the Chief of Engineers, and the Secretary of War, which have been quoted above, but no more definite determination of title to the crane appears, nor was the matter of title in issue at that time. Finding 52, as it appears in the court's findings, was an almost complete adoption of finding 73 of the Commissioner's report. Finding 73 of the Commissioner's report, in the former case, concluded with the sentence: "From August 28, 1930, plaintiff has thought that he had title to the unloading facilities." This sentence was eliminated in the court's finding 52, because title was not in question, and this was the only material deletion or change made in the Commissioner's report upon this point. No exception was taken by either party to finding 73 of the Commissioner's report.

The brief of Goltra's attorneys in the first Goltra case, filed February 13, 1939, stated in part: " * * * defendant left its unloading apparatus on plaintiff's runways after the seizure and thus encumbered his land with a useless structure, the salvage value of which was not equal to the cost of removal. While in 1930, defendant made an effort to abandon the unloading structure to plaintiff, we know of no principle which permits a party to abandon a substantial structure on the property of another and, by the act of abandonment, escape liability for the encumbrance * * *. By reason of the nature of the unloading apparatus, plaintiff has been required to hire * * * watchmen * * * who have guarded the unloading apparatus for the benefit of the defendant from July, 1926, down to the present time [1939]."

In the brief for defendant, filed March 27, 1939, counsel stated:

" * * * He [Goltra] also claims * * rental for the facilities themselves which belong to the defendant. * * *

"To endeavor to charge the Government with rent for the unloading facilities which the Government itself owned, is in itself a complete demonstration of the extreme and fantastic character of the contentions advanced on some branches of this claim. One might as well confront the owner of a residence with a bill for rent!"

Counsel for the Government now urge that the foregoing statements indicate failure of consideration for any possible sale based upon the 1930 negotiations. The matters advanced deal with a theory not pleaded in the earlier Goltra case, and not proved at trial. The evidence submitted both at the trial of the earlier and the instant case shows that after August 31, 1930, Goltra and his successors in interest treated the crane as belonging to them, while the Government treated the crane as having been disposed of by it. Goltra's pleadings in the former case followed this theory. Statements unrelated to the joined issues of the prior action made by counsel in briefing that case under court rules allowing pleading of alternative positions based upon contrary assumptions of fact are entitled to little weight, particularly when there exists no indication whatever that the court in the earlier case accepted such statements of counsel as fact and acted upon them. Whatever weight may be assigned plaintiff's inconsistencies would bear primarily upon the question of adverse possession rather than upon the question of consideration. So far as the 1930 transaction is concerned, there was either a sale then, or there was not. If the transaction between Goltra and the Government amounted to a sale in 1930, it is immaterial what they, in 1939, thought they had done. A manifestation of mutual assent by the parties to a contract is essential to its formation and the acts by which such assent is manifested must be done with the intent to do those acts; but, generally, neither mental assent to the promises in the contract nor real or apparent intent that the promises shall be legally binding is essential. Restatement of Contracts, § 20.

It is clear that were private parties involved here plaintiffs' right to the crane by the mere fact of asserted ownership since 1930 would be such that, in all proba-

bility, there would have been no lawsuit.[1] The Government, however, benefits from the long-established principle that statutes of limitations, adverse possession, laches, and the unauthorized acts of agents do not militate against its rights. United States v. Summerlin, 310 U.S. 414, 60 S.Ct. 1019, 84 L.Ed. 1283; Utah Power & Light Co. v. United States, 243 U.S. 389, 408–409, 37 S.Ct. 387, 61 L.Ed. 791. Since there seems to be no basis for concluding that, as has been suggested, the Act of June 3, 1924, 43 Stat. 360, 49 U.S.C.A. § 151, transferred title to the crane to the Inland Waterways Corporation, the peculiar questions which arise when the sovereign is party to a suit must be resolved.

 A primary consideration is whether or not the Chief of Engineers and the Secretary of War, or either of them, had authority to dispose of the crane. If they did not, their ostensible agency may not be invoked to bind the United States. If either official possesed authority to dispose of the crane, it then becomes necessary to determine whether or not they exercise that power. Plaintiffs and defendant agree that the Chief of Engineers possessed authority to enter into the contracts for lease and sale of the barges, towboats, and unloading facilities, and that this power was derived from the Act of June 15, 1917, 40 Stat. 182, as amended, which, as a wartime measure, authorized the President to buy, build, or requisition ships, plants, and material, providing further that: "All ships, constructed, purchased, or requisitioned under authority herein, or heretofore or hereafter acquired by the United States, shall be managed, operated, and disposed of as the President may direct."

The President's statutory authority was delegated by Executive Order to the Secretary of War. See Exec. Orders 2644, July 11, 1917; 3018, Dec. 3, 1918; 3063, March 12, 1919; 3064, March 12, 1919. The Act of June 15, 1917, supra, defined "plant" to include: "any * * * discharging termi-

nal and any facilities or improvements connected with any of the foregoing descriptions of property."

Although specifically authorizing the President to manage, operate, and dispose of *ships* acquired under the Act, no such use and disposal provision was included to cover *plants,* and it has been urged here that the Secretary of War never possessed authority to dispose of terminal facilities. It was the contemporaneous and, we believe, the correct interpretation of the Act that the power to manage, operate, and dispose of plants acquired under the Act was included in the grant of power to so deal with the ships which the plants were designed to service. Any other interpretation would have resulted in denial of the power of plant acquisition and ship operation, and would have presented the ridiculous situation of a Government agency empowered to acquire facilities needed in the war effort—but not authorized to use the facilities acquired, or to dispose of them at the end of their usefulness. Where a reasonable meaning is possible, a statutory interpretation leading to absurd results is to be avoided. Lynch v. Alworth-Stephens Co., 267 U.S. 364, 370, 45 S.Ct. 274, 69 L. Ed. 660.

 The defendant relies heavily upon the fact that the Act from which the Chief of Engineers (as subordinate to the Secretary of War) ultimately derived his authority to enter into the contract, expired 6 months after the conclusion of war with the German Empire [2] and that the Act itself was repealed long prior to 1930. We think this theory is inapplicable here because the power conferred by the Act of June 15, 1917, to manage, operate, and dispose, was exercised when the contract for lease with option to purchase was entered into. Once the power was properly exercised the subsequent expiration of authority became immaterial. The termination of power in the President and his delegated subordinates to enter further agree-

---

1. The Missouri Statute of Limitations applying to actions involving personal property is 5 years; involving real property, 10 years. Rev.St.Mo. Secs. 1002–B and 1014, R.S. 1949 Mo. §§ 516.010, 516.120.

2. War with the German Empire was officially ended by joint resolution of both houses of Congress signed by the President on July 2, 1921.

ments of this kind took no validity away from a subsisting contract entered into while the Act remained in full force. The authority of the Chief of Engineers to bind the United States as contracting officer in this particular transaction has never been questioned. Having the power to represent the Government in making the contract, the Chief of Engineers had the power to negotiate and enter into a modification or settlement of the contract in the interest of the United States. United States v. Corliss Steam-Engine Co., 91 U.S. 321, 23 L.Ed. 397.

The Government's 5-year lease of Goltra's crane site expired July 14, 1927. At its expiration, the United States had the right under the contract to a renewal, under which it would be liable for rent, or the right to remove the crane from Goltra's property. Neither was done until 1930, the Government evidently awaiting the conclusion of litigation. In that year the Secretary of War and the Chief of Engineers concurred in disposing of the gantry crane and in the settlement of the Goltra rent claims. Although the parties involved in 1930 and those litigating here employ the word "abandon" when speaking of the Government's disposition of the crane, it is clear that there was in this case no abandonment in the strict legal sense. The legal concept of abandonment is not met without a showing that the article was given up with the idea that it should return to the public domain, or with no idea at all except that the owner was dispossessing himself of it. There can be no abandonment of property *to* another. Abandonment must be made by the owner, without being pressed by any duty, necessity, or utility to himself, but simply because he no longer desires to possess the thing; and, further, it must be made without any desire that any other person shall acquire the same; for if it were made for a consideration it would be a sale or barter, and if without consideration, but with intention that some other person should become possessor, it would be a gift. Stephens v. Mansfield, 11 Cal. 363. We need not, therefore, consider whether or not the Government officials involved here possessed the authority to abandon Government property, because, clearly, no abandonment occurred or was intended. The record contains no hint of any purported relinquishment of the crane into the mass of the public domain with no care or thought of who the next appropriator might be. The disposition of the crane was to Goltra, and that disposition was either a gift or a sale. Because of the presence of an offer, acceptance and consideration, we hold it to have been a sale. Goltra's letter of February 13, 1930, was an offer to release rental claims in return for the crane. Goltra had a claim for rental for use of his property. The Secretary of War's reply was not an outright rejection of Goltra's offer, although it could have been so construed by Goltra, who had conditioned his offer upon the Government's "immediate release" to him of the unloading facilities. This question becomes unimportant in the light of the Acting Secretary of War's letter of August 13, 1930. That letter referred to the prior conversations and correspondence with Goltra, thus reviving those terms and constituting a new offer if not an acceptance of Goltra's original offer. Goltra's actions upon receipt thereof indicated that he considered his original offer still open and accepted; they equally indicated an acceptance of this new offer. Cf. Restatement of Contracts, §§ 73, 20. Goltra obtained the concurrence of his contracting officer, the Chief of Engineers, in the offer and from that day forward treated the crane as his own and the Government as having been released from claims for rent. Early evidence of Goltra's relinquishment of rental claims is found in a "corrected bill" submitted to the Chief of Engineers on May 14, 1931. In this bill, submitted nearly a year after the exchange of letters discussed above, Goltra claimed land rental, improvements rental, and watchmen pay only to August 31, 1930, and interest from that date to date of payment, thereby recognizing that no claim for rental accrued after that date. Goltra's pleadings in the earlier Goltra case affirmed this position.

In the giving up of these claims for rent by Goltra, immediate considera-

tion passed for the sale of the crane, for it is elementary that the giving up of a legal right, even a tenuous cause of action, is good consideration for a bargain. Restatement of Contracts, §§ 75, 76. At the time the crane was valueless, an obstruction, and a liability, the Government was glad to acquiese in Goltra's position. Had Goltra claimed additional rent after the sale, the Government would have had a defense to his claim. Goltra did not claim rent after this period, but claimed ownership in the crane. The Government received the entire consideration it bargained for. It was relieved from claim for rental at some $6,000 a year or a dismantling and salvage loss of some $35,000. We think it is clear that the contracting officer had the authority to close out the contract he had made when circumstances intervened which made impossible the anticipated fulfillment of the contract objectives. By this transaction the Government saved money. It was to the Government's advantage to seek termination upon these terms, and the Secretary of War would not have fully performed his duty had he not sought such an advantageous solution. See, 28 Op. Atty. Gen. 121.

It has been suggested that the Secretary of War's seizure in 1923 had already terminated the contract, thus putting it beyond the contracting officer's power of modification. The Secretary of War's unilateral act terminated the contract as a working agreement, but it did not settle the liabilites of the parties. As long as the crane occupied Goltra's land, the obligation arising under the contract to pay rental remained. That obligation could be extinquished only by removing the Government's equipment or by reaching some agreement with the landowner. The latter course was adopted, and was a reasonable settlement of what had been a losing venture to all concerned. It was a proper exercise of the contracting officer's discretion and authority.

Inasmuch as we hold the crane to have been sold to Goltra in 1930, it becomes unnecessary to discuss the effect of the 1940 judgment upon this case, except to note that it is in no way inconsistent with the holding here, that decision having been based upon the tortious seizure of the barges, towboats, and unloading equipment, and no determination of title at that date having been made. United States v. Goltra, 312 U.S. 203, 209, 61 S.Ct. 487, 85 L.Ed. 776. It is obvious from the record that the court did not in the former judgment include any amount which would, in any way, affect plaintiff's right to recover on the claim now made.

The value of the crane having been stipulated, and it having been determined that the plaintiff herein was the owner thereof on the day of requisitioning, judgment will be entered for the plaintiff for just compensation in the amount of $100,000, with interest thereon at 4 percent per annum, as a part of just compensation from September 6, 1943, to date of payment. It is so ordered.

JONES, Chief Judge, and HOWELL, and MADDEN, Judges, concur.

WHITAKER, Judge, concurs in the result.