**The CONFEDERATED SALISH AND KOOTENAI TRIBES OF the FLATHEAD RESERVATION, MONTANA**

v.

**The UNITED STATES.**

No. 50233.

United States Court of Claims.
Oct. 18, 1968.
Certiorari Denied Jan. 20, 1969.
See 89 S.Ct. 691.

John W. Cragun, Washington, D. C., attorney of record, for plaintiff. Wilkinson, Cragun & Barker, and Richard A. Baenen, Washington, D. C., of counsel.

John D. Sullivan, Washington, D. C., with whom was Clyde O. Martz, Asst. Atty. Gen., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

DAVIS, Judge.

A claim which the Confederated Salish and Kootenai Tribes have pressed in this conglomerate suit (see, e. g., 181 Ct.Cl. 739, 741) is that the Government erroneously surveyed the boundaries of the reservation carved out for plaintiff by the Treaty of Hell Gate, 12 Stat. 975 (signed on July 16, 1855, proclaimed on April 18, 1859).[1] In Confederated Salish and Kootenai Tribes of Flathead Reservation, Montana v. United States, 173 Ct. Cl. 398 (1965), the court held that certain of the defendant's surveys were incorrect and that, as a result of these errors, a portion of plaintiff's territory had been taken by the defendant. The parties are now engaged in a proceeding, pursuant to Rule 47(c), to determine these lands and their value.

In this proceeding a dispute has arisen whether certain of these lands, some 10,585.86 acres since placed in national forests, are included in the claim. In the belief that it would gain more from an accounting for the past income of the land as well as the attributes of its present ownership, the claimant now asserts that these forest properties still belong to the tribes, have never been taken by the United States, and are therefore not a part of the present claim. The defendant demurs and insists that the claim encompasses these national forest tracts, as well as those lands patented to third parties or granted to railroads. To settle the matter, the plaintiff moved us to instruct the trial commissioner that the forest lands "remain the property of plaintiff and hence are not the property subject of this claim." The de-

---

1. This claim is set forth in paragraphs 8 and 9 of the petition ("erroneous boundary surveys").

fendant disagreed.[2] We disposed of the motion by entering an order, on July 3, 1968, instructing the commissioner "that the lands erroneously excluded from the exterior boundary of plaintiff's reservation by reason of the faulty survey, which lands are now in national forests, have not remained the property of plaintiff and therefore are property subject to the claim in suit and should be treated as such." Because the problem warranted a spelling out of our views, we added that "[a]n opinion of the court will follow in due course."[3] This is that opinion.

 The northern boundary of the plaintiff's reservation was erroneously surveyed in 1887, the southwestern in 1893. See 173 Ct.Cl. at 400, 403. As a result, considerable land which actually belonged within the reservation was thereafter treated as part of the federal public domain. In February 1897 President Cleveland proclaimed as a national forest, under the authority of the Act of March 3, 1891, 26 Stat. 1095, an area including the part erroneously excluded by the incorrect northern boundary. In November 1906 President Theodore Roosevelt, under the Act of June 4, 1897, 30 Stat. 11, 36, placed within the pre-existing Lolo National Forest the portion of the Indian land excluded by the improper southwestern line. These lands have since been retained in the national forests. The Supreme Court has made it clear that, if the putting of such treaty-reservation tracts in national forests was authorized or ratified by Congress, the Federal Government thereby took the Indians' property and they are entitled to compensation. United States v. Creek Nation, 295 U.S. 103, 110–111, 55 S.Ct. 681, 79 L.Ed. 1331 (1935); Chippewa Indians of Minn. v. United States, 305 U.S. 479, 481–483, 59 S.Ct. 313, 83 L.Ed. 300 (1939). See, also, Tlingit and Haida Indians of Alaska v. United States, 389 F.2d 778, 781–782, 182 Ct.Cl. 130 (Jan. 1968); id., 177 F.Supp. 452, 467–468, 147 Ct.Cl. 315, 340–41 (1959); Uintah and White River Bands of Ute Indians v. United States, 152 F.Supp. 953, 958, 139 Ct.Cl. 1, 9 (1957); Ute Indians v. United States, 45 Ct.Cl. 440, 461–462 (1910); Pueblo de Zia v. United States, 19 Ind.Cl.Comm. 56, 74 (1968).

The Tribes' point is, essentially, that the Presidents were never empowered by Congress to put these particular lands within the forest reserves, and therefore that these placements were, at least, no more than unauthorized torts which did not utilize the power of eminent domain or divest the Indians of their title and interest. Cf. United States v. Goltra, 312 U.S. 203, 208–209, 61 S.Ct. 487, 85

2. In addition to responding on the merits of the motion, the defendant argued that, under the special jurisdictional statute (Act of July 30, 1946, 60 Stat. 715), this court had no jurisdiction to decide whether the lands involved are the plaintiff's property. The contention is that Congress intended to confer jurisdiction to render money judgments only. But wholly apart from our power to grant formal declaratory relief under the special act (cf. King v. United States, 390 F.2d 894, 182 Ct.Cl. 631 (Feb.1968)), it is plain that we can decide any issue going to the amount of the recovery to which plaintiff is entitled. The present issue is precisely of that kind. If plaintiff prevailed in its view, its monetary recovery on this claim would be directly affected.

3. In full text, the court's order was as follows:

"This case comes before the court with reference to 'Paragraphs 8 and 9—Erroneous Boundary Surveys' on plaintiff's motion, filed March 1, 1968, for instructions to the commissioner on the issue of what lands are the proper subject of recovery in these suits. Upon consideration thereof, together with the response thereto, without oral argument, the trial commissioner is instructed that the lands erroneously excluded from the exterior boundary of plaintiff's reservation by reason of the faulty survey, which lands are now in national forests, have not remained the property of plaintiff and therefore are property subject to the claim in suit and should be treated as such. An opinion of the court will follow in due course.

IT IS SO ORDERED.

BY THE COURT

(sgd) Wilson Cowen
Chief Judge."

L.Ed. 776 (1941). Plaintiffs stress that, although the Act of March 3, 1891, supra (under which President Cleveland acted) authorized the President "from time to time" to "set apart and reserve" "public land bearing forests" as a forest reservation (section 24), the same statute also provided that "nothing in this act shall change, repeal, or modify any agreements or treaties made with any Indian tribes for the disposal of their lands * * * and the disposition of such lands shall continue in accordance with the provisions of such treaties or agreements * * *" (section 10). Similarly, the Roosevelt proclamation excepted "any lands withdrawn or reserved, at this date, from settlement, entry, or other appropriation * * * or which may be covered by any prior valid claim, so long as the withdrawal, reservation, or claim exists." [4] These provisions of statute and proclamation, it is said, did not permit the inclusion of lands really belonging to the plaintiffs but wrongly thought by the Federal Government to be part of its non-Indian public land; the President, on this view, had no power at all to affect that type of property and it remained the Tribes'.

The answer, to us, is given by the principles underlying the Supreme Court's opinion in Creek Nation, supra. The Court pointed out that Creek lands had been erroneously given to other Indians and to settlers—on the incorrect assumption that the tracts did not belong to the Creeks—by officers of the United States and under patents "signed by the President." 295 U.S. at 110, 55 S.Ct. 681. The United States, the Court said, could have sued to cancel these improper disposals, but did not do so. "On the contrary, it permitted the disposals to stand—not improbably because of the unhappy situation in which the other course would leave the allottees and settlers. In this way the United States in effect confirmed the disposals; and it emphasized the confirmation by retaining, with such full knowledge, all the benefits it has received from them." Ibid. The Court might have, but did not, construe the act providing for these allotments and disposals as withholding all authority to touch lands which were in fact Creek. Instead, the Court, though recognizing that the application of the statute to the Creek lands was "erroneous", treated this "erroneous application" as within the executive power under the statute, or, if not so initially, as thereafter ratified and confirmed by the Federal Government's allowing the disposals to stand. 295 U.S. at 111, 55 S.Ct. at 684.

■ Here, the formal actions of Presidents Cleveland and Theodore Roosevelt have stood for many years; the areas have been administered as, and have become part of, the national forests; they have been uniformly so treated by Congress and by the executive branch. If there was any original want of authority, in 1897 and 1906, to designate this land as an integral sector of the forest reserve, that lack has since been cured by the consistent legislative and executive treatment in the intervening years. There has, in other words, been legislative and executive confirmation and ratification, as there was held to be in Creek Nation. Such implicit recognition is fully effective. See, also, United States v. Lynah, 188 U.S. 445, 465–467, 23 S.Ct. 349, 47 L.Ed. 539 (1903); United States v. North American Trans. & Trading Co., 253 U.S. 330, 333–334, 40 S.Ct. 518, 64 L.Ed. 935 (1920).[5]

---

4. Proclamation of Nov. 6, 1906, 34 Stat. 3260. President Roosevelt acted under a statute (Act of June 4, 1897, supra) authorizing the President "at any time to modify any Executive order that has been or may hereafter be made establishing any forest reserve, and by such modification may reduce the area or change the boundary lines of such reserve, or may vacate altogether any order creating such reserve."

5. In Sioux Tribe of Indians v. United States, 316 U.S. 317, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942), and Confederated Bands of Ute Indians v. United States, 330 U.S. 169, 67 S.Ct. 650, 91 L.Ed. 823 (1947), it was found, in very different

Moreover, we decline to follow plaintiff in reading the two authorizing statutes pertinent to this case as withdrawing from the President any power to affect land which he mistakenly, though in good faith, considered to be non-Indian and public, and thus subject to being put aside for the forest reserve. Especially in view of the President's historically great powers over the public lands (e. g., United States v. Midwest Oil Co., 236 U.S. 459, 35 S.Ct. 309, 59 L.Ed. 673 (1915); Donnelly v. United States, 228 U.S. 243, 256, 33 S.Ct. 449, 452, 57 L.Ed. 820 (1913)),[6] it is preferable to interpret the legislation as giving effect to the President's good-faith actions until they are reversed, avoided, or cancelled by a direct attack. So long as they stand, they are not null and void. The language of the Acts permits this construction; the references to Indian lands and to tracts subject to other claims can easily be understood as establishing a substantive rule for the President's guidance, not as withholding from him all jurisdiction to act if it turned out that inadvertently or mistakenly he had included Indian areas in a federal forest reservation. In this case, for instance, the Presidents acted within their powers even though they were wrong in including the disputed strips in their proclamations. And because the Presidents were within their authority, their actions effected a taking of the plaintiffs' land. The Government would not be allowed to escape paying compensation for the property by arguing that the establishment of the forest reservations were mere unauthorized torts. By the same token, the Indians cannot now claim that the lands have always remained theirs.

These are the reasons for our order of July 3, 1968, instructing the trial commissioner "that the lands erroneously excluded from the exterior boundary of plaintiff's reservation by reason of the faulty survey, which lands are now in national forests, have not remained the property of plaintiff and therefore are property subject to the claim in suit and should be treated as such." We adhere to and reaffirm that order.

circumstances, that Congress and the Executive, far from ratifying or confirming a taking, had made clear their intention not to recognize any compensable rights. In United States v. Goltra, supra, 312 U.S. 203, 209, 61 S.Ct. 487, 85 L.Ed. 776 (1941), the Court likewise found no "ratification or confirmation" of a taking, but rather the exact opposite. The unexpressed assumption of all three opinions is that there can be confirmation and ratification by a course of Congressional and executive conduct.

6. In *Donnelly*, the Supreme Court said: " * * * from an early period Congress has customarily accorded to the Executive a large discretion about setting apart and reserving portions of the public domain in aid of particular public purposes."