Jacob Wallace **ANTOINE**, on his own behalf and also on behalf of his relatives similarly situated, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

No. 77–3020.

United States District Court,
D. South Dakota,
Central Division.

April 30, 1982.

Charles Rick Johnson, Johnson, Eklund & Davis, Gregory, S. D., for plaintiff.

Ray P. Murley, Asst. U. S. Atty., Sioux Falls, S. D., for defendant.

## MEMORANDUM OPINION

DONALD J. PORTER, District Judge.

### CASE SUMMARY

Following the remand of this case, *Antoine v. United States*, 8 Cir., 637 F.2d 1177 (1981), the parties again agreed to submit the case to this Court on stipulated documentary evidence. Having given this evidence due consideration, the Court finds that regardless of the cultivation or lack of cultivation of the allotment in issue by plaintiff's ancestors, judgment in this suit for damages for the loss of the allotment must be entered for plaintiff in the amount of $7,262.

### DISCUSSION

#### I.

The ruling law for this case has already been analyzed at length in this Court's earlier opinion and the Eighth Circuit Court of Appeals' opinion cited above. To briefly summarize this governing law, what is at issue here is an allotment granted in 1884 to plaintiff's great-grandfather, Wicatanynaun (also known as Charles Antoine, also known as Remains Single) pursuant to Article 6 of the Sioux Treaty of April 29, 1868, 15 Stat. 635. As the Eighth Circuit recognized, continued possession of allotments taken under Article 6 was dependent on continued cultivation by the allottee or his family. The Sioux Allotment Act of March 2, 1889, 25 Stat. 888, made these Article 6 allotments indefeasible by the issuance of a trust patent if the land was taken in "conformity with" the provisions of the 1868 Treaty. This Court construed the 1889 Act to mean that patent could only issue if allottee or his family were continuing to cultivate the land in 1889, since a lack of cultivation would seem to have forfeited the allotment under the 1868 Treaty. The Eighth Circuit accepted this construction for "purposes of [the] appeal", 637 F.2d at 1179, and plaintiff does not now appear to take issue with this interpretation.

The case was remanded to this Court to determine whether defendant could "demonstrate, by a preponderance of the evidence, that Antoine's ancestors forfeited the allotment by failing to cultivate the

land between 1884 and 1889." 637 F.2d at 1181.[1]

Wicatanynaun was married, apparently by Indian custom, to Esther Milk (also known as Oyotaninwin, also known as Plain Track) sometime before 1879. They are known to have had two children, Charles Antoine, Jr., (plaintiff's grandfather), born April 25, 1879, and Eliza Antoine, born in 1881. It had been previously thought when this case was first submitted that Esther had continued as Wicatanynaun's wife until his death in 1884 or 1885, and that she thereafter married a Baptiste McKenzie. Recently discovered evidence indicates that the chronology of events was in error.

As a part of the 1912 probate proceedings of Baptiste McKenzie's estate after McKenzie's death in 1897, Esther was called to testify under oath as to her marriage to McKenzie. She testified that she married McKenzie about six months after McKenzie's divorce from his first wife. McKenzie's divorce decree, dated November 26, 1881, was made a part of McKenzie's probate record. Esther also testified that she had eight children by McKenzie. Three of these died before they were named, and there is no indication of the dates of their birth; the probate records do show that children were born of this union on or about 1882, 1886, 1888, 1890 and 1891.

The one remaining record of Wicatanynaun's allotment shows that it was issued August 8, 1884, and delivered to Wicatanynaun September 3, 1884. The description of the land was given as follows:

Beginning at the *S.E. corner* of "Blue Eyes" claim on Butte Creek: thence ½ mile west, thence 1 mile north, to a stake marked "R.S." thence ½ mile East to the west bank of Butte Creek, thence one mile south to the place of beginning.

(Emphasis supplied). Since Wicatanynaun's certificate makes reference to a Blue Eyes claim, *it would seem evident that the Blue Eyes claim was made prior in time to Wicatanynaun's claim.*

"Blue Eyes" land certificate in the vicinity of Butte Creek in Mellette County, South Dakota, was indeed issued on May 22, 1884. The description of this, like that issued Wicatanynaun, was by metes and bounds, and its precise location is, of course, unclear.

Wicatanynaun himself died of some undisclosed injury in either late 1884 or 1885. The next recorded reference to his allotment is in 1915, when his son, Charles Antoine Jr., wrote the supervisor of the Rosebud Agency, saying, "Now what I want is this, if [Wicatanynaun] is entitled to land, I want to get it in Todd County and if he is not, I want to know it." Antoine subsequently provided some family history, but the matter was somehow dropped until the commencement of this suit.

■ It was on these meager facts that a determination would have to be made whether defendant proved a lack of cultivation by Wicatanynaun's family between the years 1885 and 1889.[2] But the Court must

1. Defendant argues that this burden was improperly placed upon it, contending that the court of appeals' holding was based solely on the belief that Charles Antoine, Jr. had submitted two affidavits to the government in *compliance with a 1915 request for proof of* heirship. It appears that this belief was a misapprehension, to which this Court was also subject in its first opinion in this case, but this Court is satisfied that the Eighth Circuit did not rest its decision solely on this factor. Even before making reference to these affidavits, the court of appeals stated as a general rule of law, independent of the particular facts here, that the "government has greater access to records of Indian land claims, including records of forfeited allotments, and we think it most sensible to place the burden on the government to show that an allotment, although 'taken', has been

given up." 637 F.2d at 1180. *Further, this Court has found that, even assuming a complete lack of cultivation by plaintiff's ancestors, defendant is still liable for the loss of the disputed allotment. In view of this finding, the issue of burden of proof is irrelevant.*

2. Defendant also urges several other points, which the Court finds irrelevant to the issue of cultivation. These are the location of the allotment *Esther received in 1901, twelve years after the time period in issue here,* the fact one of Charles' 1915 inquiries about the land was written under a lawyer's letterhead, and Charles' failure to mention anything about the *location or cultivation of the land in his letters.* Esther's residence in 1901, or even 1896, without more, proves nothing about her accessibili-

find that the question of cultivation need not be reached to decide this lawsuit.

This finding stems in large part from the evidence defendant urges as the "most compelling" indication of a lack of cultivation by plaintiff's family, namely, the conflict between the Wicatanynaun and Blue Eyes claims. The description of Wicatanynaun's allotment shows that his claim began at the Southeast corner of the Blue Eyes claim and then proceeded west, Wicatanynaun's claim thus comprising most or all of the same land in Blue Eyes' claim.[3] Obviously, both Indians could not possess and cultivate the same tract of land, and the evidence of events subsequent to the 1884 issuance of certificates indicates that of the two, it was Blue Eyes who continued in possession.

By letter dated October 13, 1896, the Commissioner of Indian Affairs gave the Rosebud allotting agent directions as to how allotments under the Act of March 2, 1889 were to be made. Paragraph (2) of the letter stated that

> [o]ne hundred allotments have been made on the Rosebud Reservation under the sixth article of the treaty of April 29, 1868. . . . These allotments are confirmed by the Act of March 2, 1889 . . . . These allotments were all made on unsurveyed lands and are described by metes and bounds. Where an allotment is made covering the old allotment the tract should be adjusted to the public surveys. Where an allotee under the treaty of 1868 desires to take other land than that covered by his certificate he may be permitted to relinquish his certificate by endorsement thereon and take other land in lieu thereof.

Trust patents were issued to Blue Eyes and Sarah Blue Eyes for neighboring allotments in the vicinity of Butte Creek in 1901. The fact a Blue Eyes was still in residence on property in the same general area as the land described in the Wicatanynaun certificate, taken in light of the 1896 letter cited above, compels the conclusion that one of these was the same Blue Eyes who entered the land in May 1884. So, too, does the inference follow that Blue Eyes cultivated the tract in conformity with the 1868 Treaty to maintain possession of the land, in exclusion of all others. But this does not, as defendant contends, relieve defendant of its liability for the loss of the allotment.

Article 6 of the Treaty provides that the allotee "shall have the privilege to select, *in the presence and with the assistance of the agent in charge*" his particular tract of land. (Emphasis supplied). The chances are great that Wicatanynaun was illiterate, and even greater that he had no skill at Anglo-Saxon land measurements. It was for this reason that the local government agent was required to assist Wicatanynaun in making his selection. But in spite of the training this agent presumably possessed, and his access to the records of the other allotments in the area, Wicatanynaun was given an allotment that obviously conflicted with a prior land claim. No matter how much Wicatanynaun or his survivors might have wished to cultivate his land, it would have been virtually impossible because of this conflict. Indeed, the compelling inference is that the actual reason Wicatanynaun and his family did not cultivate their tract was because of Blue Eyes' prior possession of at least a major portion of it. As both this Court and the Eighth Circuit, 637 F.2d at 1180–81, recognized in the earlier opinions in this case, "where the Indian has done all he could to get his patent and has failed because of the neglect of public officers, the courts will generally protect him." *Arenas v. United States*, 322 U.S. 419, 434 n.17, 64 S.Ct. 1090, 1096 n.17, 88 L.Ed. 1363

ty to the land in 1889; the Court is unable to perceive any significance in the fact one letter was written in a lawyer's office, and can imply nothing from this bare fact about what advice Charles might have received. As noted by the Eighth Circuit, the government never asked Charles anything about the location or cultivation of the land, and may not have considered those points important.

**3.** Plaintiff appears to agree that the Wicatanynaun and Blue Eyes claims covered the same ground. *See* Plaintiff's Brief at 6, filed January 11, 1982.

(1944). Because it is clear that plaintiff's ancestors had done as much as they were able or required to do under the circumstances to obtain the land, and that they were prevented from doing anything further through defendant's neglect, the Court must hold that, regardless of the other evidence presented by defendant, plaintiff must be held to have prevailed on the issue of cultivation.

## II.

The Court will therefore proceed to the issue of damages. Plaintiff originally demanded the recovery of the allotment in issue, or an equivalent allotment of 320 acres, and money damages for the loss of use and income from the allotment. The Eighth Circuit held that no award of land should be made, 637 F.2d at 1182, but expressed no further view on the measure of damages. Plaintiff now asks for a sum of money equivalent to the *present* value of the allotment, compensation for the loss of income from the allotment, and interest on the lost income.

In essence, plaintiff's demand can be reduced to an argument that his ancestors should have rightfully been in possession of the allotment from 1884 to the present, receiving all the benefits of the allotment's income and its present value. An analogous argument was advanced in the somewhat similar case of *Confederated Salish & Kootenai Tribes v. United States*, 401 F.2d 785, 185 Ct.Cl. 421 (1968), *cert. den.* 393 U.S. 1055, 89 S.Ct. 691, 21 L.Ed.2d 692 (1969), where the Government had erroneously surveyed the boundaries of the Tribes' reservation, and thereafter treated a portion of the Tribe's land as public domain, eventually placing it in national forests. The Tribe contended that it should receive "an accounting for the past income of the land as well as the attributes of its present ownership ... [because the property has] never been taken by the United States." 401 F.2d at 786. The Court rejected this assertion, relying on the case of *United States v. Creek Nation*, 295 U.S. 103, 55 S.Ct. 681, 79 L.Ed. 1331 (1935). *Creek Nation* also in-

volved tribal lands erroneously classified as public lands by an incorrect survey, and sold by the United States to settlers under an 1891 Act. In both *Creek Nation* and *Confederated Salish & Kootenai Tribes*, the Government could have corrected these mistakes, but did not, and allowed them to stand for many years, in effect confirming the disposal of the lands. The Government's actions in both cases "effected a taking of the plaintiffs' land. The Government would not be allowed to escape paying compensation for the property.... By the same token, the Indians cannot now claim that the lands have always remained theirs." 401 F.2d at 789.

This compensation, as the *Creek Nation* case made clear, is the value of the land as of the date of its taking. In *Creek Nation*, the Court of Claims had entered judgment for the tribe for the value of the land as of the time of the suit. The Supreme Court reversed, holding that the value was to be calculated as of the time of the sales under the 1891 Act.

> It was through them that the lands were taken; so the compensation should be based on the value at that time, and not, as ruled below, on the value when the suit was begun. But the compensation to be awarded now should not be confined to the value of the lands at the time of the taking but should include such addition thereto as may be required to produce the present full equivalent of that value paid contemporaneously with the taking. Interest at a reasonable rate is a suitable measure by which to ascertain the amount to be added.

295 U.S. at 111–12, 55 S.Ct. at 684–85.

■ Turning to the facts of this case, it is clear that when defendant delivered to Wicatanynaun the erroneous land certificate on September 3, 1884, it effected a taking of the very land it was purporting to give him. Blue Eyes had a prior claim to the same land that would be good as long as she continued to cultivate it, as defendant well knew or should have known from its records and from the erroneous description on the certificate itself, and Wicatanynaun

had no way of ever taking possession of the allotment to which he was entitled under the 1868 Treaty. Defendant could have corrected the conflict, but did not, and even later issued a trust patent to Blue Eyes for the land. The Government therefore confirmed the loss of the Wicatanynaun allotment, taking that land as surely as it took the erroneously surveyed lands in *Creek Nation* and *Confederated Salish & Kootenai Tribes.* Under the rule of the *Creek Nation* case, defendant has assumed the obligation to pay plaintiff just compensation for that taking as of the date of the taking, including interest.

And once it is found that the land was indeed taken, how could plaintiff have any claim to the land beyond its market value at the time of taking? If the Court's finding had been the *opposite* of what has been decided, i.e., that plaintiff was entitled to possession of the land, then plaintiff would clearly have been entitled to the income from the land from the years when this possession was denied.[4] But, such is not the case here—the allotment was taken long ago, and plaintiff's rights in the land ceased once it was taken. Defendant must, of course, now finally pay just compensation for the taking, but that is all. Anything more would constitute an award of double damages.

The only evidence in the record as to the approximate value of this land in the 1880's is contained in Exhibit 8, a 1981 Bureau of Indian Affairs appraisal that was received by stipulation of the parties. This calculates that the 1889 fair market value of what appears to be the Wicatanynaun allotment was $3.89 per acre, or $1,245 for the entire 320 acres. Plaintiff does not appear to dispute this value for that year, and the Court can perceive no reason why the value is not also fairly representative for the year 1884. Further, as *Creek Nation* directs, plaintiff is also entitled to a reasonable rate of interest to produce the present full equivalent of the value of the land. *Creek Nation* applied a rate of five per cent per annum; this same rate was upheld in the more recent case of *United States v. Sioux Nation of Indians,* 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980). The Court must therefore find today that defendant is liable to plaintiff in the total amount of $7,262. The amount of the total award to which each of Wicatanynaun's heirs is entitled shall be determined, as agreed by the parties, by a departmental probate by the Office of Hearings and Appeals, pursuant to 43 C.F.R. Part 4, Subpart D, in the same manner and subject to the same requirements of notice, appearance and appeal as if it were a probate of the Estate of Wicatanynaun.

---

4. Such is the full extent of the holding in *United States v. Pierce,* 235 F.2d 885 (9th Cir. 1956), the sole authority relied upon by plaintiff for his claim for the lost rents.