Jeanette **Sablan**,
Plaintiff/Appellee,
v.
Jose **Cabrera**, et al,
Defendants/Appellees.
Civil Action No. 91-0621[1]

Joaquin C. Cabrera,
Administrator of the
Estate of Antonio M. Cabrera,
Plaintiff/Appellee,

v.
Marianas Public Land Corporation
and Isabel Cabrera,[2]
Defendants/Appellant/Appellee.
Civil Action No. 91-0687

Appeal No. 93-032
July 5, 1994

---

[1] The parties to Superior Court Civil Action No. 91-0621 did not participate in this appeal.

[2] In Superior Court Civil Action No. 91-0687, Joaquin C. Cabrera sued both Isabel Cabrera and the Marianas Public Land Corporation (MPLC). Thus, in the action below, Joaquin was a plaintiff and Isabel a defendant. For purposes of this appeal, however, Joaquin and Isabel's interests are identical, and they are both appellees.

Argued and Submitted March 8, 1994

Counsel for appellant Marianas Public Land Corporation: Bret Lubic, Saipan.

Counsel for appellee Isabel Cabrera: Timothy H. Bellas, Saipan.

Counsel for appellee Joaquin C. Cabrera, administrator of the estate of Antonio M. Cabrera: Antonio M. Atalig, Saipan.

BEFORE: DELA CRUZ, Chief Justice, VILLAGOMEZ, Justice, and MACK, Special Judge.

VILLAGOMEZ, Justice:

The Marianas Public Land Corporation (MPLC) appeals from a judgment in which the Superior Court held that the appellee, Cabrera,[3] is entitled to five hectares of homestead land. The court ordered MPLC to give Cabrera 24,927 square meters ("m²") of land in addition to the lot containing 25,073 m² that MPLC already deeded to Cabrera.

■ We have jurisdiction over this appeal pursuant to the Commonwealth Judicial Reorganization Act of 1989.[4] We affirm the judgment of the trial court.

## ISSUES & STANDARD OF REVIEW

■ The issues presented by MPLC are whether the trial court erred in:

First, denying MPLC's motion to dismiss Cabrera's complaint for failure to join indispensable parties. The trial court denied the motion as untimely. We review the trial court's decision regarding timeliness of the motion to dismiss for abuse of discretion.[5]

■ Second, finding that the Trust Territory government ("TT government") intended to issue Cabrera a permit to homestead both Lots 303 and 304.[6]

---

[3] There are actually two appellees in this case: Joaquin C. Cabrera, administrator of the estate of Antonio M. Cabrera, and Antonio's widow, Isabel Cabrera. The trial court held that the Antonio's estate *or* Isabel was entitled to land from MPLC.

Antonio's estate and Isabel each separately assert entitlement to the property interest at issue. The question as to who is entitled to the land is, however, the subject of a related dispute which is not before us. For purposes of the appeal before us, we shall treat the interests of Antonio's estate and Isabel as being identical, i.e., both agree with the trial court's decision that the government is obligated to convey additional land to whomever is found to be Antonio's successor. We shall, therefore, refer to both Isabel and Antonio's estate collectively as "Cabrera."

[4] *See* 1 CMC § 3102(a).

[5] *Cf. Barr Rubber Prods. Co. v. Sun Rubber Co.*, 425 F.2d 1114, 1126-27 n.23 (2d Cir.) *cert. denied*, 400 U.S. 878, 91 S. Ct. 118, 27 L. Ed. 2d 115 (1970) (holding that District Court did not abuse its discretion by denying, as untimely made, a motion to join a party under Fed. R. Civ. P. 20, and noting that court likewise would not have erred if motion had been made under Fed. R. Civ. P. 19),

[6] Our statement of this issue combines two separate issues presented by MPLC, i.e., whether the trial court erred in determining that the TT government authorized Antonio to enter and occupy Lot 303, and in determining that the TT government intended to issue Antonio a homestead permit to Lots 303 and 304.

Third, determining that Cabrera acquired an ownership interest in land other than Lot 302.[7]

Fourth, holding that Cabrera was entitled to compensation from the government.[8]

The second,[9] third[10] and fourth issues are mixed questions of law and fact reviewable de novo.[11]

## FACTUAL &
## PROCEDURAL BACKGROUND

In 1960 or 1961 the Cabreras began occupying an agricultural parcel of land, with the TT government's permission, near what is now known as Koblerville, Saipan. A representative of the TT government physically showed the Cabreras[12] the homestead boundaries.

### I. Lot 302

The land which the government showed Cabrera as his homestead encompassed all of Lot 302. Cabrera submitted evidence that he was also shown Lots 303 and 304 as part of his agricultural homestead.

The TT government issued Cabrera a homestead permit ("permit") on June 17, 1961, for Lot "304." A numerical figure on the permit indicated that the homestead contained 28,152 m². On January 24, 1967, the TT government issued a certificate of compliance ("certificate") based on the same homestead permit and containing the same quantity of land and the same lot number.

The permit includes a sketch of the shape of the land. The shape does not, however, correspond with Lot 304 but with Lot 302. Furthermore, the metes and bounds description for both the permit and the certificate does not cover any part of Lot 302. When plotted on a current map of the area, the description encompasses all of Lot 303, most of Lot 304, and part of another piece of adjoining property. The parties indicated at oral argument that the land area, based on the metes and bounds description in the permit and certificate, is approximately 28,000 m².

Cabrera has continuously occupied and used Lot 302 since about 1961.[13] He constructed buildings, erected a fence and grazed livestock on Lot 302.

On December 5, 1990, MPLC issued a quitclaim deed conveying Lot 302 to Cabrera, pursuant to the Homestead Waiver Act of 1980,[14] certifying that Cabrera entered Lot 302 in 1960. In the present action, the parties do not contest the propriety of this conveyance, and they do not dispute that Cabrera acquired ownership of 25,073 m² of Lot 302 through the conveyance.[15] However, Cabrera maintains that he acquired an ownership interest in Lots 303 and 304 as well as 302. Our analysis, therefore, focuses on Cabrera's asserted interests in Lots 303 and 304.

### II. Lots 303 and 304

By homestead permit dated June 17, 1961, the TT government authorized Vicente Cabrera ("Vicente") to enter, occupy, and use Lot 303. Although Vicente never built any substantial improvements or resided on Lot 303, the TT government issued a certificate of compliance, dated January 24, 1967, to Vicente for this lot. By

---

[7] MPLC framed this issue as "[w]hether the trial court erred in granting [Cabrera] additional land as compensation for the taking of Lot Nos. 303 and 304 when neither party was able to prove that [Cabrera] ever had an ownership interest in said lots." Brief for Appellant MPLC at 1.

[8] MPLC framed this issue as "[w]hether the trial court erred in granting [Cabrera] land in addition to that which was described in [Cabrera's] original homestead permit." Id.

[9] Cf. Kelley v. Harsch, 161 S.W.2d 563, 567 (Tex. Ct. App. 1942) (holding that where latent ambiguity exists regarding identity of real property described in a will, question as to what testatrix intended to devise is a mixed question of law and fact).

[10] Cf. In re Estate of Mueilemar, 1 N.M.I. 441, 444, 445 n.3 (1990) (holding that conclusion as to ownership of land is a legal question where parties do not dispute trial court's findings of fact).

[11] Apatang v. Mundo, 4 N.M.I. 90, 92 (1994).

[12] Because Antonio Cabrera was blind, Isabel, his wife, guided him.

---

[13] After Antonio Cabrera died in 1973, Isabel, his widow, continued to occupy and use the lot.

[14] PL 2-13 (enacted Feb. 9, 1981; codified as amended at 2 CMC § 4321 et seq.). This act authorizes MPLC to grant deeds to a person able to "demonstrate continuous and actual occupancy or use of public land for agricultural purposes for a period of 15 years prior to January 9, 1978," 2 CMC § 4323, regardless of whether the government had issued the person an agricultural homestead permit. See 2 CMC § 4322(a).

[15] MPLC actually issued the quitclaim deed to Lot 302 to Isabel. Antonio died in 1973. In a matter related to this appeal but not before us now, Antonio's estate and Isabel disagree about which of them should hold title to Lot 302.

quitclaim deed dated December 21, 1977, the TT government conveyed Lot 303 to Vicente.

By homestead permit dated June 17, 1961, the TT government authorized Bonifacio Muna ("Bonifacio") to enter, occupy, and use Lot 304. Although Bonifacio did not *receive* his permit or certificate of compliance for Lot 304 until 1972, and did not occupy the lot until approximately 1973, the TT government issued a certificate of compliance, dated January 24, 1967, to Bonifacio for Lot 304. By quitclaim deed dated December 21, 1977, the TT government conveyed Lot 304 to Bonifacio.

Cabrera grazed livestock on land outside the boundaries of Lot 302. Cabrera's son, Antonio Cabrera, Jr., testified that, as a boy, he tended cattle that were grazing on what are now Lots 303 and 304. Jesus San Nicholas testified that he worked on Cabrera's homestead and helped build a fence that encompassed an area greater than that of what is now Lot 302.

In 1978, an employee of the Land Commission was instructed, without any explanation, to change the lot numbers on Cabrera's permit and certificate from 304 to 302. The employee made this change.

Two former employees of the Land Commission testified that during the early to mid-1970s, Cabrera complained on more than one occasion about the decreased size of his homestead land. The Land Commission files document one of these complaints.

On the day of trial, MPLC moved to dismiss Cabrera's complaint for failure to join indispensable parties. Cabrera objected, arguing that, among other things, the motion should have been made before trial. The trial court took the matter under advisement during a short recess. The court subsequently denied MPLC's motion as untimely, pointing out that the trial had been continued on four previous occasions.

The trial court found that "[t]here are numerous errors noted in the documents relating to all three Lots."[16] The trial court concluded that the land documents in this case are incorrect and ambiguous as a matter of law and that the documents should be construed against the TT government as drafter. Focusing on the intent of the parties, the court held, in pertinent part, that: (1) the TT government authorized Cabrera to enter and occupy Lots 302, 303 and 304; (2) the TT government intended to issue Cabrera a permit to Lots 302, 303 and 304; (3) Cabrera did enter, occupy, and use Lots 302, 303 and 304; (4) the TT government mistakenly permitted Vicente and Bonifacio to enter, occupy and use Lots 303 and 304, which Vicente and Bonifacio now own in fee

---

[16] Findings of Fact ¶ 12, *Cabrera v. Marianas Pub. Land Corp.*, Civ. Nos. 91-0621 & 91-0687 (consol.) (N.M.I. Super. Ct. Apr. 15, 1993) (decision and order).

simple; (5) Cabrera was entitled to five hectares; and (6) the government must compensate Cabrera with 24,927 m² of land.[17] MPLC timely appealed.

## ANALYSIS

### I. Whether the Trial Court Erred in Denying MPLC's Motion to Dismiss Cabrera's Complaint for Failure to Join Indispensable Parties

MPLC asserted the defense of failure to join indispensable parties[18] by making an oral motion, on the morning of trial, to dismiss Cabrera's complaint pursuant to Com. R. Civ. P. 12(h)(2). The trial court denied the motion as untimely.[19] We find no abuse of discretion.

■ Com. R. Civ. P. 12(b)(7) specifies that a Com. R. Civ. P. 19[20] defense of "failure to join a *party*"[21] may

---

[17] The trial court also held that Cabrera's action was not barred by laches. MPLC has not appealed this determination.

[18] The record does not clearly reveal the identities of the allegedly indispensable parties. In making its motion to dismiss, MPLC stated that "there's some evidence that at least part of these [L]ots [303 and 304] have now been deeded to other people [than Bonifacio and Vicente], but that hasn't been fully ascertained at this time." Transcript of Proceedings—Excerpts [large volume] at 44, *Sablan v. Cabrera*, Civ. Nos. 91-0621 & 91-0687 (consol.) ("Transcript (large vol.)"). Bonifacio testified that he now lives on Lot 304, and he did not mention having conveyed any of this land to anyone. MPLC did not order the transcript of Vicente's widow's testimony.

On appeal, MPLC suggests, Brief for Appellant MPLC at 5, 10, and Cabrera does not dispute, that Bonifacio and either the estate or Vicente's widow are the parties alleged to be indispensable. We will assume, therefore, that Bonifacio and either the estate or Vicente's widow are the correct and only absent parties that MPLC asserts are indispensable.

[19] *See* Transcript (large vol.), *supra* note 18, at 60.

[20] Com. R. Civ. P. 19 provides, in pertinent part:

(a) <u>Persons to be Joined if Feasible</u>. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if
(1) in his absence complete relief cannot be accorded among those already parties, or
(2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may
(i) as a practice [sic] matter impair or impede his ability to protect that interest or

be interposed by motion, which "shall be made *before pleading if a further pleading is permitted.*"[22] Com. R. Civ. P. 12(h)(2), however, provides that a defense "of failure to join a *party indispensable* under [Com. R. Civ. P.] 19 . . . may be made . . . *at the trial* on the merits."[23] Commentators suggest, and we agree, that this apparent inconsistency in Com. R. Civ. P. 12 should be resolved in favor of permitting a trial court to address the merits of Com. R. Civ. P. 19 motions, even after the close of pleadings, as long as this furthers the policies of the joinder rule and does not prejudice the original parties.[24]

 In the present case, although MPLC was technically entitled, on the morning of trial, to raise the defense of failure to join indispensable parties under Com. R. Civ. P. 12, the trial court had the discretion to deny the motion as untimely under the circumstances.[25]

Cabrera did not have notice of or a chance to respond to the motion until the day of trial. The trial already had been continued four times.[26] In addition, although MPLC sought vicariously to protect the absent parties' interests, and not its own,[27] MPLC called Vicente's widow and Bonifacio as witnesses at trial. These absent parties made no attempt to intervene in the action and were not affected by the complaint at issue, or by the remedy fashioned by the trial court.

## II. Whether the Trial Court Erred in Finding that the TT Government Intended to Issue Cabrera a Permit to Homestead Lots 303 and 304

 The trial court took proper note of the proposition that "[t]he homestead is an estate *sui generis* governed by the homestead law. Homesteads are purely statutory and give no greater right than the statute itself

---

(ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party.

(b) <u>Determination by Court Whenever Joinder Not Feasible</u>. If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and in good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include . . . .

[21] Com. R. Civ. P. 12(b)(7) (emphasis added). This provision appears to apply specifically to defenses based on Com. R. Civ. P. 19(a). *See* 7 Charles A. Wright, Arthur R. Miller & Mary K. Kane, FEDERAL PRACTICE AND PROCEDURE [hereinafter "Wright"] § 1609 (2d ed. 1986) (discussing Fed. R. Civ. P. 12, identical in pertinent part to Com. R. Civ. P. 12).

[22] Com. R. Civ. P. 12(b) (emphasis added).

[23] Com. R. Civ. P. 12(h)(2) (emphasis added). This provision appears to apply specifically to defenses based on Com. R. Civ. P. 19(b). *See* Wright, *supra* note 21, § 1609.

[24] See *id.* This is consistent with Com. R. Civ. P. 21, which provides that "[p]arties may be dropped or added by order of the court on motion of any party or of its own initiative *at any stage of the action* and on such terms as are just." (Emphasis added.) *See* Wright, *supra* note 21, § 1609.

[25] *See id..* Since we affirm the denial of MPLC's motion on the grounds cited by the trial court, we do not address the issue, discussed at length on appeal by Isabel, of the feasibility of joinder of the allegedly indispensable parties. However, we

note that had the trial court reached the merits of MPLC's motion, the court would have considered whether the absent parties should have been joined (i.e., were necessary parties) before it considered whether such parties' joinder was feasible. *See Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990) (discussing Fed. R. Civ. P. 19). Specifically, a trial court conducting a Com. R. Civ. P. 19 analysis would determine:

First, whether the absent party *should* be joined (i.e., is necessary) under Com. R. Civ. P. 19(a). This is a discretionary matter.

Second, if the absent party should be joined (i.e., is necessary), then whether the party *can* be joined.

Third, if joinder is feasible, then, under the mandatory language of Com. R. Civ. P. 19(a), such joinder must be ordered.

Fourth, if the absent party's joinder is not feasible, then whether, under the factors listed in Com. R. Civ. P. 19(b), the action should proceed without the absent party. This is a discretionary matter, although the outcome of the indispensability analysis may turn on underlying questions of substantive law. If, in the court's discretion, the action should not proceed without the absent party, then the absent party will be deemed indispensable. If the action may proceed without the absent party, then the absent party will not be considered indispensable.

[26] Transcript (large vol.), *supra* note 18, at 60.

[27] The timeliness factor would weigh even more heavily against MPLC if it had delayed in protecting its own interests. *See* Fed. R. Civ. P. 19 advisory committee's note on the amended rule [1966], subdivision (b).

creates."[28] The court concluded, however, that (1) where a deed is ambiguous or incorrect, an examination should be made of what the parties intended to convey, and (2) where documents contain ambiguities, the ambiguities must be construed against the party that drafted the documents.[29] These rules of construction are inappropriate in the context of grants of public land made through a homestead program.

 A court must strictly construe in favor of the government a document evincing a grant of public land.[30] Grants by the government,[31] in contrast to conveyances or grants by private grantors,[32] should be interpreted according to the intention of the government, apparent on the face of the grant.[33]

In the instant case, the trial court concluded that the government intentionally issued Cabrera a permit to homestead not only Lot 302, but Lots 303 and 304 as well.[34] The record below supports this determination.

First, Cabrera's permit and certificate contain an identical metes and bounds description which, when plotted on a current map, encompasses all of Lot 303 and a substantial portion of Lot 304.[35] The parties agreed at oral argument that this metes and bounds description also encompasses some land outside of Lots 303 and 304, and that it covers none of Lot 302, although Cabrera entered, occupied and used Lot 302.

Second, the permit and certificate originally identified Antonio's Lot as 304 rather than 302. This, MPLC concedes, constitutes "some evidence that Antonio . . . was authorized to enter Lot No. 304."[36] MPLC nevertheless argues that the handwritten change in the lot number on the documents from 304 to 302, made by Land Commission employee Felix Sakisat in 1978, evinced the government's intent to convey Lot 302, and not Lots 303 and 304.[37] This argument contradicts the contents of the documents themselves.

 When the government alleges that a mistake was made in a land grant document, the court should examine the document to determine the intent the government had *at the time of the grant*, not the intent that the government later asserts it otherwise had.[38] Moreover, where the face of a document granting land does not fully disclose the government's intent, a court may consider extrinsic facts, e.g., the subject matter involved, history, and end sought to be obtained.[39] In other words, in the construction of an unclear grant, the court may consider parol evidence of the attendant and surrounding circumstances at the time the grant was made in order to place

---

[28] *Pelisamen v. Land Comm'n*, 3 CR 790, 794 (N.M.I. Trial Ct. 1989) (citations omitted).

[29] *See* Conclusions of Law, *supra* note 16, ¶¶ 2 and 6.

[30] *See United States v. Grand River Dam Auth.*, 363 U.S. 229, 80 S. Ct. 1134, 42 L. Ed. 2d 1186 (1960).

[31] For purposes of analysis, we consider the words "grant" or "patent" and "certificate of compliance" to be interchangeable, to the extent that each describes a document which the government issues pursuant to a land grant statute, and which transfers to the patentee or certificate holder a vested interest in public land. *See* 2 CMC § 4312 and 67 TTC § 212 (both sections specifying that a certificate of compliance issued under the provisions of the applicable homestead law creates a right to the issuance of the deed of conveyance of any and all right, title and interest of the government in the property in the holder of the certificate).

[32] Distinguishing between rights acquired under grants of public land on the one hand and through private land sales on the other, one court explains that "the disposal of public lands was not a matter of sale at all but rather of a gift on condition, and this gift on condition was not according to the common-law concept, but according to certain statutory conditions designed to satisfy a special need." *Petition of S.R.A., Inc.*, 18 N.W.2d 442, 446 (Minn. 1945) (citation omitted), *aff'd sub nom.*, *S.R.A., Inc. v. Minnesota*, 327 U.S. 558, 66 S. Ct. 749, 90 L. Ed. 851 (1946); *see also* 3 Norman J. Singer, STATUTES AND STATUTORY CONSTRUCTION § 64.07 (5th ed. 1992).

[33] *Cf. United States v. 1,078.27 Acres of Land*, 446 F.2d 1030, 1036 (5th Cir. 1971) (discussing legislative grants), *cert. denied*, 405 U.S. 936, 92 S. Ct. 945, 30 L. Ed. 2d 811 (1972).

[34] Conclusions of Law, *supra* note 16, ¶¶ 3-4.

[35] *See* Findings of Fact, *supra* note 16, ¶ 9. MPLC does not challenge this finding on appeal, and did not submit a transcript of the testimony of the experts who, according to the parties at oral argument, testified about this issue at trial. Nor has any contention been made by the parties that the metes and bounds description, when plotted on the original survey map, encompasses a pertinently different area of land than it does on a current map. The sketches of Lots 302, 303 and 304 that appear on Cabrera, Vicente, and Bonifacio's respective homestead permits match the shapes of Lots 302, 303 and 304 on a current map. We conclude for purposes of this appeal, therefore, that the metes and bounds description on Cabrera's permit and certificate, when plotted on either a current map or the map in use at the time the certificate was issued, encompasses pertinently the same area of Lots 303 and 304, none of Lot 302, and a portion of land outside of all three of these lots.

[36] Brief for Appellant MPLC at 10.

[37] *Id.* at 12.

[38] *Weaver v. Knudson*, 127 N.W.2d 217, 221 (Wis. 1964).

[39] *See 1,078.27 Acres of Land*, 446 F.2d at 1036.

the court in the same situation and give it the same advantages which were possessed by the actors themselves in construing the document.[40]

In this case, the TT government issued Cabrera his permit and certificate in 1961 and 1967, respectively. The unexplained handwritten changes to the lot numbers on the permit and certificate were not made until 1978, eleven years after issuance of the certificate which gave Cabrera a vested interest in the homestead land.

We note that in Cabrera's permit and certificate, although the metes and bounds description corresponds with Lots 303 and 304, the numerical figure of the quantity of land corresponds to the amount of land originally comprising Lot 302, i.e., 28,152 m². MPLC asserts that this supports its argument that the TT government intended to convey only Lot 302 to Cabrera, and that Cabrera is entitled only to the amount of land originally contained in Lot 302.[41] The law, however, does not support this argument.

In construing the extent of the conveyance by a patent, the metes and bounds, courses and distances that define the boundary, govern.[42] The numerical quantity figure (in this case, 28,152 m²) is the least reliable of all descriptive particulars.[43]

The metes and bounds description in Cabrera's permit and certificate encompasses all of Lot 303 and a major portion of Lot 304; it does not encompass any of Lot 302. Additionally, Cabrera testified that an employee of the TT government physically showed Cabrera the homestead, with boundaries that encompassed Lots 302, 303 and 304. Finally, a former employee of the Land Commission testified that it was the TT government's practice in 1960 and 1961 to grant homesteads of up to five hectares.[44]

We find no error in the trial court's conclusion that the TT government intended to authorize Cabrera to enter, occupy and use Lots 303 and 304. The TT government did not intend to convey only 28,152 m² of land to Cabrera. However, we find no evidence in the record that the TT government intended to convey more than a total of five hectares—the standard homestead—to Cabrera.

Cabrera seeks a maximum of only five hectares. He has already received 25,073 m² (Lot 302) from the government under the Homestead Waiver Act of 1980. In this action for compensation, therefore, the trial court correctly awarded up to, but no more than, 24,927 m² of land, the difference between 50,000 m² (five hectares) and 25,073 m² (the amount of land in Lot 302).

### III. Whether Cabrera Acquired Ownership Interests in Lots 303 and 304

Our analysis does not stop with our conclusion that the TT government authorized Cabrera to homestead Lots 303 and 304, because a claimant to public land does not acquire a vested right in the land, as against the government, until the claimant has complied with all the prerequisites for the acquisition of title.[45] With respect to this issue, MPLC argues that Cabrera never acquired an ownership interest in land other than Lot 302.[46] We disagree.

The trial court concluded that "[f]or some unexplainable reason, the government mistakenly permitted Vicente . . . and Bonifacio . . . to enter, occupy, and

---

[40] *Cavazos v. Trevino*, 73 U.S. (6 Wall.) 773, 18 L. Ed. 813 (1869). The court does not admit parol evidence to show that a party meant something other than what he or she said, but to show what he or she meant *by* what was said. *Larsen v. Johannes*, 86 Cal. Rptr. 744, 749 (Cal. Ct. App. 1970) (quoting *United Iron Works v. Outer Harbor Dock & Wharf Co.*, 141 P. 917, 920 (Cal. 1914)).

[41] See Brief for Appellant MPLC at 6-7.

[42] *Goff v. Lowe*, 80 S.W. 219, 221 (Ky. Ct. App. 1904).

[43] Cf. *Estate of Taisacan v. Hattori*, 4 N.M.I. 26, 30-31 (1993), and *Tellei v. Ngodrii*, 2 TTR 450, 452 (Trial Div. 1963) (both cases construing deeds).

[44] Due to the dearth of preserved primary documents recording laws promulgated by TT government, Commonwealth courts sometimes turn to secondary sources, such as

publications by the TT government and its employees. Cf. *In re Estate of Rangamar*, 4 N.M.I. 72, 75 (1993) (taking judicial notice of a TT government publication as a source of information about Carolinian land custom). One secondary source notes that applicants for homesteads under the TT government could be given a specific parcel of land, but that it could not be more than five hectares in area. Richard G. Emerick, *Land Tenure in the Marianas*, in 1 Office of the Staff Anthropologist, Trust Territory of the Pacific Islands, LAND TENURE PATTERNS, TRUST TERRITORY OF THE PACIFIC ISLANDS 233-34 (1958).

[45] See *Pelisamen*, 3 CR at 794-95; see also *Cruz v. Johnston*, 6 TTR 354, 357-58 (Trial Div. 1973) (noting that homesteaders who received certificates of compliance were entitled to deeds of conveyance, and holding that the issuance of such deeds may be compelled).

[46] Reply Brief for Appellant MPLC at 5.

utilize Lot[s] 303 and 304."[47] The court also found that Cabrera did enter, occupy and use Lots 303 and 304.

MPLC does not expressly challenge either of these determinations, but asserts simply that Vicente's and Bonifacio's entry, use and improvement of Lots 303 and 304 prevented Cabrera from acquiring identical, vested interests in the property.[48] The record does not support this argument.

■ The TT government issued Cabrera a document certifying that he complied with his homestead permit. As previously discussed, the metes and bounds in the certificate, when plotted on a current map, encompass all of Lot 303 and most of Lot 304.

The certificate constitutes affirmative evidence that Cabrera complied with all prerequisites to its issuance[49] and acquired a vested interest[50] in the land it describes. As between Cabrera on the one hand and Vicente and Bonifacio on the other, evidence introduced at trial supports the Superior Court's finding that Cabrera entered, occupied and used Lots 303 and 304.[51]

A witness testified that he helped erect a fence on Cabrera's homestead, the boundaries of which exceeded the current boundaries of Lot 302.[52] Cabrera's son testified that, as a child, he tended cows on Lots 303 and 304. Consistent with the statements of these witnesses,

Bonifacio testified that he did not receive his permit and certificate of compliance until 1972, and that he did not occupy Lot 304 until 1973 or 1974. Vicente's widow testified that she and her husband never resided or built any substantial improvements on Lot 303.

We hold that the trial court did not err in finding that Cabrera entered, occupied and used 24,927 m[2] of land comprising Lots 303 and 304.[53]

## IV. Whether Cabrera Is Entitled to Compensation from the Government in the Form of Land

■ Cabrera acquired a vested interest in the land encompassed by the metes and bounds description in his certificate. The TT government mistakenly authorized Vicente and Bonifacio to enter, occupy and use Lots 303 and 304, and it later issued certificates of compliance and

---

[47] Conclusions of Law, *supra* note 16, ¶ 5.

[48] Brief for Appellant MPLC at 8-9.

[49] *Cf. McCullen v. Sproles*, 28 So. 2d 218, 220 (Miss. 1946) (en banc) (holding that recitals in land patent were affirmative evidence that patentee paid requisite price for land).

[50] *See* 67 TTC § 208 (1970 Ed.) ("Deeds of conveyance shall be issued by the government . . . for homestead land entered under the provisions of this chapter; PROVIDED, that no such deed shall be issued until . . . the execution of a certification by the district administrator certifying that the homesteader has complied with all laws, rules and regulations appertaining to the homestead"); *Cruz*, 6 TTR at 357-60 (holding that under 67 TTC § 208, issuance of deeds of conveyance may be compelled once government issues certificate of compliance to homesteader). Subsequent to *Cruz*, the legislature enacted PL 5-71 (1974) (codified at 67 TTC §§ 212, 213 (1980 Ed.)), section 1 of which specifies that "[a] certificate of compliance issued under the provisions of Section 208 of [Title 67] of [the TT] Code creates a right to the issuance of the deed of conveyance." *See* 67 TTC § 212.

[51] We express no opinion regarding the extent, if any, of Bonifacio's and Vicente's compliance with the requirements of their homestead permits.

[52] Findings of Fact, *supra* note 16, ¶ 5.

[53] *See Antoine v. United States*, 537 F. Supp. 1163, 1165-66 (D.S.D. 1982), *aff'd in part and vacated in part on other grounds*, 710 F.2d 477 (8th Cir. 1983). In Antoine, a case factually similar to the one at bar, the plaintiff claimed compensation for land that allegedly should have been patented to his predecessor in interest. The government had issued certificates to both plaintiff's predecessor ("Native American # 1") and to Native American # 2 for the same parcel of land. The government subsequently issued a patent to the land to Native American # 2. The court observed:

> The chances are great that [Native American # 1] was illiterate, and even greater that he had no skill at Anglo-Saxon land measurements. It was for this reason that the . . . government agent was required to assist [Native American # 1] in making his selection. But in spite of the training this agent presumably possessed, and his access to the records of the other allotments in the area, [Native American # 1] was given an allotment that obviously conflicted with a prior land claim. No matter how much [Native American # 1] or his survivors might have wished to cultivate this land [as required by statute], it would have been virtually impossible because of this conflict.

*Id.* at 1166. For this reason, the court concluded that it would protect the plaintiff's interests by holding that the plaintiff's predecessors complied with the statutory requirements necessary to acquire a vested interest in the allotted land. *Id.* at 1167. Here, a finding in favor of Cabrera is even more compelling because there is evidence that he did, in fact, comply with the requirements of his permit.

deeds for the lots to Vicente and Bonifacio. These government actions constituted a taking of Cabrera's property.[54]

■ The trial court correctly awarded public land to Cabrera as compensation for the taking of 24,927 m$^2$ of land comprising Lots 303 and 304. This award is consistent with Commonwealth constitutional[55] and statutory[56] law expressing a policy of favoring compensation in the form of public land, as opposed to monetary damages, where the government takes private property.

Based on the analysis above, we **AFFIRM** the decision of the trial court.

---

[54] *Cf. Antoine*, 710 F.2d at 479 (holding that government's conduct constituted a taking where the government erroneously confirmed Native American # 1's selection, pursuant to treaty, of a tract of land that was previously selected by Native American # 2, whose possession of the tract prevented Native American # 1 from complying with statutory requirements for issuance of a patent).

[55] N.M.I. Const. art. XIII, §§ 1-2 (the Commonwealth government may not take private land without just compensation and may take private land only to accomplish a public purpose for which no public land is available).

[56] *See, e.g.*, Public Purpose Land Exchange Authorization Act of 1987, PL 5-33 (1987) (codified as amended at 2 CMC § 4141 et seq.). The TT government followed a policy which similarly dictated, for example, that "[w]hen it is necessary to retain privately owned land for government purposes, it is preferable from all points of view that the owner . . . be compensated by award of title to other land, rather than by cash payment." Trust Territory Policy Letter P-1 from Deputy High Commissioner, Trust Territory of the Pacific Islands, to Civil Administrators of Saipan, Truk, Ponape, Majuro, Kwajalein, Palau and Yap at ¶ 17 (Dec. 29, 1947), *in* James B. Johnson, Senior Land Commissioner, Mariana Islands District Division of Land Management, Trust Territory of the Pacific Islands, LAND OWNERSHIP IN THE NORTHERN MARIANA ISLANDS: AN OUTLINE HISTORY app. F (1969) (submitted to symposium at Suva, Fiji, 1969).